[Crim. No. 17154. In Bank. July 25, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK WESTON HYDE III, Defendant and Appellant.

**COUNSEL**

George H. Chula for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Daniel J. Kremer, Mark L. Christiansen and Alan S. Meth, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant Frederick Weston Hyde III appeals from a judgment of conviction entered upon a plea of guilty to the charge of possessing restricted dangerous drugs (Health & Saf. Code, § 11910) discovered in the course of an "airport search" of defendant's hand luggage. Defendant principally contends the evidence against him was the product of an unreasonable search in violation of the Fourth Amendment to the United States Constitution. We conclude the search in question was lawful according to the Fourth Amendment standards set forth below and therefore affirm the judgment.

The facts revealed here are a typical consequence of the airplane boarding procedures employed in recent years in California and throughout the United States.[1] On December 24, 1971, United States Deputy Marshal Budd Johnson stopped defendant as he attempted to board a Western Airlines flight from San Diego International Airport to Phoenix because defendant allegedly satisfied the Federal Aviation Administration's behavioral profile of a potential hijacker and activated a magnetometer indicating

---

[1]On December 5, 1972, the Federal Aviation Administration (FAA) ordered that as of January 5, 1973, all carry-on items must be searched prior to boarding and all passengers must be screened at least through a magnetometer, a device designed to detect the presence of metal. (Dept. of Transportation Release No. 103-72, Dec. 5, 1972.) The search at issue in the instant case occurred before the promulgation of any formal regulations by the FAA requiring specified boarding procedures, but subsequent to the President's directive of September 11, 1970, that the Department of Transportation have airlines adopt appropriate surveillance techniques at whichever airports deemed necessary. (1970 Public Papers of Presidents of the United States: Richard Nixon 742-743 (G.P.O. 1971).)

Also, in October 1968 a task force comprised of representatives of the FAA, the Department of Justice, and the Department of Commerce was appointed to develop for the airlines, inter alia, a behavioral profile of objective characteristics common to all potential hijackers. (See *United States* v. *Lopez* (E.D.N.Y. 1971) 328 F.Supp. 1077, 1082; McGinley & Downs, *Airport Searches and Seizures—A Reasonable Approach* (1972) 41 Fordham L.Rev. 293, 302.)

the presence of metal. Johnson asked defendant to place his hand luggage on a table. Defendant, saying nothing, complied with the request and proceeded to open his bag. Johnson looked inside, noticed a shaving kit, and, explaining that such containers often include items which normally set off a magnetometer, removed the kit and opened it. Johnson discovered therein a clear plastic baggy containing a substance which appeared to be marijuana. He returned the plastic baggy to the kit, closed it, and placed defendant under arrest for possession of marijuana. Johnson then conducted a pat-down search of defendant and escorted him to an office approximately 30 feet away. A further search of defendant's luggage revealed an estimated 100 tablets of what Johnson believed to be LSD.

At the outset we note there is no issue of consent, actual or implied. The trial court determined defendant had not consented to the search and the People on appeal do not challenge the factual finding.[2]

However, the People have contended on trial and appeal that Johnson's search of defendant's hand luggage was reasonable in view of the Fourth Amendment principles established by the United States Supreme Court in *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]. *Terry* considered the extent of the rights under the Fourth Amendment accorded to an individual confronted on the street by a police officer investigating possible criminal activity. The court held that when a police officer is otherwise entitled to detain an individual to inquire into suspicious circumstances, he may conduct a limited pat-down search for weapons to protect himself if he has an articulable reason to believe the individual is armed and dangerous.

It is tempting to draw, in the manner of numerous jurisdictions, an analogy between *Terry* and the typical facts herein.[3] In *Terry,* the court upheld a search undertaken without either a warrant or probable cause on the ground that the governmental interest in the protection of law en-

---

[2]In any event, the consent theory is inappropriate. Consent, to be valid, must be free and voluntary. (*Bumper* v. *North Carolina* (1968) 391 U.S. 543, 548 [20 L.Ed.2d 797, 802, 88 S.Ct. 1788].) The court in *United States* v. *Kroll* (8th Cir. 1973) 481 F.2d 884, 886, pointed out that "Compelling the defendant to choose between exercising Fourth Amendment rights and his right to travel constitutes coercion; the government cannot be said to have established that the defendant freely and voluntarily consent [*sic*] to the search when to do otherwise would have meant foregoing the constitutional right to travel."

[3]A number of federal cases have justified airport searches on the authority of *Terry.* See, e.g., *United States* v. *Moreno* (5th Cir. 1973) 475 F.2d 44; *United States* v. *Bell* (2d Cir. 1972) 464 F.2d 667; *United States* v. *Epperson* (4th Cir. 1972) 454 F.2d 769; *United States* v. *Lindsey* (3d Cir. 1971) 451 F.2d 701; *United States* v. *Lopez* (E.D.N.Y. 1971) *supra,* 328 F.Supp. 1077.

forcement officers, on balance, so outweighed the interest of the individual in being free from official intrusion of minimal scope as to satisfy the Fourth Amendment requirement of reasonableness. Here too, it is argued, airport searches can be validated by a similar balancing of the serious governmental interest in the prevention of airplane hijackings and the attendant danger to life and property with the minimally intrusive search necessary to reduce substantially the likelihood of a successful hijacking. However, an examination of the theoretical and practical underpinnings of *Terry* suggests the decision is in fact inapposite to the case at bar and the problem of airport searches.

A principal difficulty in applying *Terry* to the instant problem arises from the scope of the search which that case sanctioned. *Terry* was explicit in permitting an officer who makes an investigative stop of suspicious individuals on the street "to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." (392 U.S. at p. 30 [20 L.Ed.2d at p. 911].) Nowhere in the opinion can a suggestion be found that an officer in such circumstances is entitled to undertake a more thorough or intrusive search beyond a superficial pat-down for weapons. Indeed, the majority of federal decisions adopting the *Terry* rationale to justify airport seizures deal with the mere frisking of suspicious passengers resulting in the discovery of contraband and do not consider the possibility of extending that authority to justify an unrestricted baggage search. (See, e.g., *United States* v. *Lopez* (E.D.N.Y. 1971) *supra,* 328 F.Supp. 1077; *United States* v. *Lindsey* (3d Cir. 1971) *supra,* 451 F.2d 701; *United States* v. *Epperson* (4th Cir. 1972) *supra,* 454 F.2d 769; *United States* v. *Bell* (2d Cir. 1972) *supra,* 464 F.2d 667; *United States* v. *Moreno* (5th Cir. 1973) *supra,* 475 F.2d 44; but see *United States* v. *Slocum* (3d Cir. 1972) 464 F.2d 1180.) Therefore, assuming arguendo that *Terry* is relevant to the question of airport seizures, we believe the decision at best approves a pat-down screening of suspicious passengers but cannot serve to justify Johnson's search of defendant's hand luggage.

Another obstacle to deciding the instant case under *Terry* principles is the level of suspicion that case requires an officer to possess before he may initiate a pat-down search of a detained individual. A protective frisk may be predicated only upon "specific and articulable facts" which would warrant "a reasonably prudent man in the circumstances . . . in the belief that his safety or that of others was in danger." (392 U.S. at pp. 21, 27 [20 L.Ed.2d at pp. 906, 909].) The People suggest because defendant satisfied the anti-hijacking profile and activated a magnetometer, Johnson

acted reasonably in proceeding to search defendant according to *Terry*. In 1971, however, when hijackings posed a more repetitive menace than currently, available surveys indicated only 1 out of every 15 passengers who both fit the profile and set off a magnetometer was likely to be found with a weapon. (*United States* v. *Lopez* (E.D.N.Y. 1971) *supra,* 328 F.Supp. 1077, 1097.) There is grave doubt that an approximately 6 percent probability of discovering weapons would warrant a reasonably prudent man in the belief that a particular individual was "armed and presently dangerous." (392 U.S. at p. 30 [20 L.Ed.2d at p. 911].) Moreover, if the level of suspicion required by *Terry* is reduced, there appears no discernible limitation to an extension permitting the wholesale frisking of the general public whenever a serious threat of crime emerges. California courts have consistently rejected such a blunderbuss approach since *Wirin* v. *Horrall* (1948) 85 Cal.App.2d 497 [193 P.2d 470], insisted upon Fourth Amendment protection for highway travellers. Properly viewed, therefore, the magnetometer and the FAA profile represent instruments of convenience which help to expedite pre-departure screening procedures, but do not, in themselves, generate adequate information to support a pat-down under *Terry*.

In any event, even were we to conclude the profile and the magnetometer are sufficient together to sustain a *Terry* search, the People offer no justification for subjecting passengers to a magnetometer screening in the first place. ■ The magnetometer, though minimally intrusive, unquestionably operates to search individuals within the meaning of the Fourth Amendment: the machine reveals the presence of metal objects in areas under personal control as to which the individual maintains a reasonable expectation of privacy and freedom from governmental inspection. (*Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507].)[4] As a result, our justification of the ultimate search under *Terry* on the basis of a magnetometer reading would constitute bootstrapping to an impermissible degree. If the magnetometer is to be relied upon as a ground for a search, it must itself first be legitimated under the Fourth Amendment.

The *Terry* rationale presents another problem when applied to airport searches. The case emphasizes that at the heart of the decision to allow a pat-down search of individuals whom an officer has detained and believes to be dangerous is the recognition of society's paramount interest in

---

[4]Although it could be argued that the widespread measures employed to combat hijackings have resulted in the elimination of all expectations of privacy at airports, such a concept would sanction an erosion of the Fourth Amendment by the simple and expedient device of its universal violation.

the self-protection of its police force. "[I]n addition [to the governmental interest in the efficient investigation of crime], there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." (392 U.S. at p. 23 [20 L.Ed.2d at p. 907]; see also *United States* v. *Robinson* (1973) 414 U.S. 218 [38 L.Ed.2d 427, 94 S.Ct. 467].) In airport searches, on the other hand, the People concede that the danger purportedly justifying the search occurs after the plane is airborne, at which time the law enforcement officers remain safely on the ground. It might be argued that *Terry* contemplates the protection of innocent bystanders as well, in light of the high court's statement that the "sole justification of the search in the present situation is the protection of the police officer *and others nearby.*" (Italics added.) (392 U.S. at p. 29 [20 L.Ed.2d at p. 911].) The discussion in the case makes clear, however, that the safety of bystanders is a relevant factor to support a search only when those persons are placed in a position of danger as an immediate consequence of the police officer's act of detaining for investigation an individual involved in suspicious conduct.

It follows from the foregoing analysis that *Terry* will not serve to justify either the search in the instant case or airport searches in general as they are routinely conducted in the absence of special circumstances which may bring a particular search within its rationale.

Nevertheless, we do find support under the Fourth Amendment for the pre-departure screening of prospective passengers in the series of United States Supreme Court decisions relating to administrative searches. (*United States* v. *Biswell* (1972) 406 U.S. 311 [32 L.Ed.2d 87, 92 S.Ct. 1593]; *Wyman* v. *James* (1971) 400 U.S. 309 [27 L.Ed.2d 408, 91 S.Ct. 381]; *Colonnade Corp.* v. *United States* (1970) 397 U.S. 72 [25 L.Ed.2d 60, 90 S.Ct. 774]; *See* v. *City of Seattle* (1967) 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737]; *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727]; see also *United States* v. *Davis* (9th Cir. 1973) 482 F.2d 893; *United States* v. *Schafer* (9th Cir. 1972) 461 F.2d 856; *Downing* v. *Kunzig* (6th Cir. 1972) 454 F.2d 1230.) ■ These cases recognize that "searches conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime, may be permissible under the Fourth Amendment though not supported by a showing of probable cause directed to a particular place or person to be searched." (*United States* v. *Davis* (9th Cir. 1973) *supra,* 482 F.2d 893, 908.)

In applying the administrative search doctrine to the instant case, we

bear in mind that the essential purpose of the anti-hijacking system established by the FAA is not to ferret out contraband or to preserve for trial evidence of criminal activity. Nor, as appears above, are airport searches intended to provide a means of self-protection for investigators performing official duties as in *Terry*. ■ Instead, pre-departure screening procedures are a central phase of a comprehensive regulatory program designed to insure that dangerous weapons will not be carried onto an airplane and to deter potential hijackers from attempting to board. (*United States* v. *Lopez* (E.D.N.Y. 1971) *supra,* 328 F.Supp. 1077, 1082-1083; McGinley & Downs, *Airport Searches and Seizures—A Reasonable Approach* (1972) *supra,* 41 Fordham L.Rev. 293, 304; Sen. Rep. No. 93-14 (1973).)

The fact that airport searches, by virtue of sheer numbers, will inevitably lead to the detection of some individuals involved in criminal conduct unrelated to the commandeering or destruction of aircraft does not alter the fundamentally administrative character of the screening procedure. If the initial intrusion is justifiable as part of a regulatory effort to prevent the hijacking of airplanes, the incidental discovery of contraband does not offend the Fourth Amendment. (*Harris* v. *United States* (1968) 390 U.S. 234 [19 L.Ed.2d 1067, 88 S.Ct. 992].)

■ Like all searches subject to the Fourth Amendment, an administrative screening must be measured against the constitutional mandate of reasonableness. In the case of administrative searches, however, "there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." (*Camara* v. *Municipal Court* (1967) *supra,* 387 U.S. 523, 536-537 [18 L.Ed.2d 930, 940].) It is ironic, therefore, that by adopting the administrative search doctrine to evaluate the validity of airport screening procedures we must undertake a similar process of balancing to that which would have followed from a reliance upon *Terry.*

■ The governmental interest in the prevention of airplane hijackings is substantial. Air piracy offers a unique opportunity for the political terrorist, the extortionist, or the mentally disturbed to command attention by placing in jeopardy the lives of passengers and crew, as well as private property worth millions of dollars. Hijackings constitute a significant threat to the orderly operation of air commerce and to the stability of international relations. Furthermore, the dangers posed by air piracy are in no way hypothetical: although the FAA boarding procedures have considerably reduced the number of these occurrences in the United States, in 1972 a total of 28 hijackings of American passenger aircraft took place.

(Note, *Constitutionality of the 1973 Airport Searches: A Factual Analysis* (1973) 8 U.S.F. L.Rev. 172.)

When weighed against the gravity of the governmental interest involved, a pre-departure screening of all passengers and carry-on baggage sufficient in scope to detect the presence of lethal weapons or explosives cannot be viewed as unreasonable. Unlike the suspects in a criminal investigation, prospective airline passengers generally welcome routine inspection procedures because they are the direct and immediate beneficiaries of the screening system; security precautions increase the likelihood of safe arrival at their chosen destination. If for no other reason than the airline's economic stake in the satisfaction of its passengers, airport searches are customarily conducted in a courteous and expeditious manner, and thus are not comparable to the "annoying, frightening, and perhaps humiliating experience" of a criminal search. (*Terry* v. *Ohio* (1968) *supra,* 392 U.S. 1, 25 [20 L.Ed.2d 889, 908].) Moreover, the airport departure lounge is "the one channel through which all hijackers must pass before being in a position to commit their crime. It is also the one point where airport security officials can marshal their resources to thwart such acts before the lives of an airplane's passengers and crew are endangered." (*United States* v. *Moreno* (5th Cir. 1973) *supra,* 475 F.2d 44, 51.) As stated in *Camara* v. *Municipal Court* (1967) *supra,* 387 U.S. 523, 527 [18 L.Ed.2d 930, 934], and quoted in *United States* v. *Schafer* (9th Cir. 1972) *supra,* 461 F.2d 856, 859, "it is doubtful that any other canvassing technique would achieve acceptable results." Little can be done to deter the hijacker once he has successfully boarded the airplane, and as yet no unerringly accurate procedure has been devised to restrict pre-departure searches only to those who are potential hijackers.

 That airline officials may have no particularized suspicion a prospective passenger is armed or dangerous does not operate to vitiate the search. In *Camara,* the leading case in the field of administrative searches, the court held that administrative inspections to enforce community health and welfare regulations could be undertaken on less than probable cause to believe that particular dwellings were maintained in violation of the housing code. To initiate a regulatory search, an official need only show that "reasonable legislative or administrative standards for conducting *an area inspection* are satisfied." (Italics added.) (387 U.S. at p. 538 [18 L.Ed.2d at p. 941].) Since, as discussed above, the program to monitor aircraft boarding is reasonable under the Fourth Amendment, it follows from the area inspection concept of *Camara* that everyone entering airport departure facilities is equally subject to screening for dangerous weapons. A similar rationale was employed in *United States* v. *Schafer* (9th Cir. 1972) *supra,* 461 F.2d 856, to approve administrative searches at

airports for quarantined plants. Thus the validity of a particular search does not depend upon the individual creating a minimal level of initial suspicion by satisfying the profile, activating a magnetometer, or meeting any other indicia of questionable circumstances.[5]

In upholding airport screening procedures because of their regulatory nature, we recognize that "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." (*Terry* v. *Ohio* (1968) *supra,* 392 U.S. 1, 19 [20 L.Ed.2d 889, 904], citing *Warden* v. *Hayden* (1967) 387 U.S. 294, 310 [18 L.Ed.2d 782, 793-794, 87 S.Ct. 1642] (Fortas, J., concurring); *Preston* v. *United States* (1964) 376 U.S. 364, 367-368 [11 L.Ed.2d 777, 780-781, 84 S.Ct. 881]; *Agnello* v. *United States* (1925) 269 U.S. 20, 30-31 [70 L.Ed. 145, 148, 46 S.Ct. 4, 51 A.L.R. 409].) Pre-boarding inspections must be confined to minimally intrusive techniques designed solely to disclose the presence of weapons or explosives.

It has been urged that airline officials should obtain a search warrant before inspecting individual passengers. Although *Camara* required a warrant in the context of its particular holding, the court emphasized that its decision was not "intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations. See *North American Cold Storage Co.* v. *City of Chicago,* 211 U.S. 306 (seizure of unwholesome food); *Jacobson* v. *Massachusetts,* 197 U.S. 11 (compulsory smallpox vaccination); *Compagnie Francaise* v. *Board of Health,* 186 U.S. 380 (health quarantine); *Kroplin* v. *Truax,* 119 Ohio St. 610, 165 N.E. 498 (summary destruction of tubercular cattle)." (387 U.S. at p. 539 [18 L.Ed.2d at p. 941].) The proper inquiry, according to *Camara,* is "whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." (*Id.* at p. 533 [18 L.Ed.2d at p. 938]; also see *United States* v. *Schafer* (9th Cir. 1972) *supra,* 461 F.2d at p. 858.)

Airport searches are singularly unsuited to the warrant procedure. Every day through airport terminals nationwide pass thousands of airline travellers, each of whom must be screened for weapons or explosives. The result is a form of ongoing emergency rendering it impracticable, if not

[5]Airport screening techniques in many metropolitan airports have recently been supplemented by the use of X-ray machines which make a fluoroscopic examination of hand luggage.

Defendant contends he was denied due process of law because the trial court severely limited his ability to cross-examine Johnson as to the contents and reliability of the FAA profile. However, since the applicability of the profile is not a critical factor to sustain the search under the view adopted herein, such a limitation becomes irrelevant.

impossible, for airline officials to seek a search warrant for individual passengers.[6] Imposing a warrant requirement for airport screenings would lead either to inordinate and unacceptable delays in the boarding process, or else to the issuance of a pro forma warrant broad enough to cover all prospective passengers within a given period. In addition, two safeguards exist which mitigate whatever undesirable consequences flow from eliminating the need for a warrant to initiate an airport search. First, because all passengers are required to undergo a screening as a condition to boarding the airplane, there is no danger as there was in *Camara* that the decision to search a particular individual will be "subject to the discretion of the official in the field." (387 U.S. at p. 532 [18 L.Ed.2d at p. 937]; see also *Almeida-Sanchez* v. *United States* (1973) 413 U.S. 266 [37 L.Ed.2d 596, 93 S.Ct. 2535].) Second, as indicated above, airport screening procedures must be as limited in intrusiveness as is consistent with their justification, and an individual may avoid submitting to a search altogether by electing not to board the airplane.

■ Given the foregoing articulated standards by which to judge the validity of airport screening programs, it becomes clear that the search at issue in the instant case was reasonable under the Fourth Amendment. Deputy Marshal Johnson and the Western Airlines officials had the right and the administrative duty to screen all boarding passengers for weapons or explosives. In order to expedite the screening procedure Johnson properly relied upon the profile and the magnetometer, which had been indiscriminately invoked, to select defendant as a candidate for further inspection. There is no evidence that Johnson abused his authority by conducting an exploratory investigation into defendant's bag or that the scope of the search exceeded its justification. Indeed, all indications point to the conclusion that Johnson took only the minimally necessary precautions to insure that defendant was not carrying materials inimical to a safe air journey. The marshal, therefore, acted lawfully in proceeding to search defendant's bag.[7]

The judgment is affirmed.

McComb, J., Burke, J., and Clark, J., concurred.

---

[6]See generally Jesmore, *The Courthouse Search* (1974) 21 U.C.L.A. L.Rev. 797, 809. Some commentators have thrown up their hands and insisted "None of the existing exceptions to the warrant can be successfully adapted to validate the airport search system." (Note, *The Constitutionality of Airport Searches* (1973) 72 Mich. L.Rev. 128, 152.) The latter writer suggested "the courts should create a new exception that would cover airport procedures." (*Ibid.*)

[7]The decision herein applies the now-settled administrative search doctrine in the context of airport boarding procedures and does not declare "new law." The opinion, therefore, is not merely prospective in effect, but bears upon any relevant cases

**WRIGHT, C. J.**—I agree with the majority view that the FAA anti-hijack screening procedures currently in effect suffer from no constitutional infirmity. In my view, however, the rationale adopted by the majority fails to provide an adequate basis for today's holding. I find it necessary, therefore, to express my opinion as to the proper resolution of the unique problem confronting us.[1]

The majority approaches the question of the constitutionality of airport searches by labeling them as "administrative searches" and then justifies their lawfulness under the "administrative search doctrine" established in *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727] and its companion case, *See* v. *City of Seattle* (1967) 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737]. In doing so, however, the majority in my opinion fails to give proper weight to several unique features of airport searches which distinguish them from the health and fire inspections involved in *Camara* and *See* and, for that matter, from many other types of governmental intrusions frequently characterized as administrative searches.

For example, the health or fire inspector seeks to enter and inspect a person's dwelling or place of business; absent a valid consent the entry and inspection may not be conducted without a prior showing of some functional equivalent to probable cause; there is no advance notice that the inspection will be conducted; and the owner or occupant may not lawfully refuse permission to enter and search once the inspector has secured proper judicial authorization. In contrast, the airport searches whose constitutionality we uphold today involve only a cursory inspection of the individual and his carry-on possessions conducted as a condition placed upon use of a public conveyance; there is no requirement of any level or quantum of probable cause; there is advance notice of the airport screening procedure; and the individual may avoid being searched by electing not to travel by airplane to his intended destination.[2] These particular features of the airport search, moreover, are characteristic of other "public facility screening searches" such as those one may be subjected to upon entering a courthouse or other public building or facility.

---

pending on direct appeal. (*Gallik* v. *Superior Court* (1971) 5 Cal.3d 855, 859-860 [97 Cal.Rptr. 693, 489 P.2d 573], and cases cited.)

[1]The views expressed herein were prompted in large part by the excellent discussion of prevailing judicial approaches to the airport search question in Note, *The Constitutionality of Airport Searches* (1973) 72 Mich. L.Rev. 128.

[2]Indeed, the only significant similarity between the searches involved in *Camara* and airport preboarding screening searches is that the primary purpose of both types of search is other than the gathering of evidence to be used in a criminal prosecution.

(See *Downing* v. *Kunzig* (6th Cir. 1972) 454 F.2d 1230 [federal building]; *Barrett* v. *Kunzig* (M.D.Tenn. 1971) 331 F.Supp. 266, cert. den., 409 U.S. 914 [34 L.Ed.2d 175, 93 S.Ct. 232] [federal courthouse]; see also *United States* v. *Miles* (9th Cir. 1973) 480 F.2d 1217 [screening of commercial vehicles entering restricted area on military post].)

Lord Mansfield wisely observed long ago that "the law does not consist in particular cases; but in general principles, which run through the cases, and govern the decision of them." (*Rust* v. *Cooper* (1777) 2 Cowp. 629, 632; 98 E.R. 1277, 1279.) Rather than attempt to compress airport searches within the confines of *Camara*—and rely on fictions such as the concept of an "on-going emergency" to do so—we should resolve the constitutional issues on the basis of the principles underlying the delicate balancing process which lies at the heart of a small but significant segment of our Fourth Amendment jurisprudence.[3] This balancing process focuses on the Fourth Amendment's standard of reasonableness and requires an examination of all the salient features of the particular type of search and seizure under scrutiny. (*Wyman* v. *James* (1971) 400 U.S. 309, 318-324 [27 L.Ed.2d 408, 414-418, 91 S.Ct. 381]; *Terry* v. *Ohio* (1968) 392 U.S. 1, 19 [20 L.Ed.2d 889, 904, 88 S.Ct. 1868]; *Camara* v. *Municipal Court, supra*, 387 U.S. 523, 537-538 [18 L.Ed.2d 930, 940-941]; see *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 272-273 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206].)

There is general agreement that the Fourth Amendment's mandate of reasonableness derives its substantive content from, and is shaped by, the command that "no warrants shall issue but upon probable cause." (*Cady* v. *Dombrowski* (1973) 413 U.S. 433, 439 [37 L.Ed.2d 706, 713, 93 S.Ct. 2523], see also p. 451 [37 L.Ed.2d p. 720] (Brennan, J., dissenting); *Almeida-Sanchez* v. *United States* (1973) 413 U.S. 266, 277 [37 L.Ed.2d 596, 605, 93 S.Ct. 2535] (Powell, J., concurring); *United States* v. *United States District Court* (1972) 407 U.S. 297, 315 [32 L.Ed.2d 752, 765, 92 S.Ct. 2125]; *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 473-484 [29 L.Ed.2d 564, 587-594, 91 S.Ct. 2022]; *Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507]; *Camara* v. *Municipal Court, supra*, 387 U.S. 523, 528-529 [18 L.Ed.2d 930, 935-936].) Thus, "searches conducted . . . without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (*Katz* v. *United States, supra*, 389 U.S. 347, 357 [19 L.Ed.2d 576,

---

[3]See generally Greenberg, *The Balance of Interests Theory and the Fourth Amendment: A Selective Analysis of Supreme Court Action Since Camara and See* (1973) 61 Cal.L.Rev. 1011.

585]; *Cady* v. *Dombrowski, supra,* 413 U.S. 433, 439; *Camara* v. *Municipal Court, supra,* 387 U.S. 523, 528-529; see *United States* v. *United States District Court, supra,* 407 U.S. 297, 314-321 [32 L.Ed.2d 752, 764-769].) Similarly, with very few exceptions,[4] "In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution." (*Chambers* v. *Maroney* (1970) 399 U.S. 42, 51 [26 L.Ed.2d 419, 428, 90 S.Ct. 1975]; *Almeida-Sanchez* v. *United States, supra,* 413 U.S. 266, 270 [37 L.Ed.2d 596, 601].) These principles are now part of our constitutional subsoil and, accordingly, where the government conducts searches without a warrant and without probable cause, as in an airport search, our determination as to the lawfulness of the governmental action "requires the essential Fourth Amendment inquiry into the 'reasonableness' of the search and seizure in question, and the way in which that 'reasonableness' derives content and meaning through reference to the warrant clause." (*United States* v. *United States District Court, supra,* 407 U.S. 297, 309-310 [32 L.Ed.2d 752, 762]; see *Terry* v. *Ohio, supra,* 392 U.S. 1, 20 [20 L.Ed.2d 889, 905].)

The probable cause requirement is the appropriate starting point for an inquiry into the constitutionality of current FAA airport pre-boarding screening searches.[5] The traditional concept of "probable cause," with its rigorous demands for reliability and specificity in the information upon which government action is predicated,[6] is the "time-honored" standard

---

[4]See, e.g., *United States* v. *United States District Court, supra,* 407 U.S. 297 [domestic national security wiretap]; *United States* v. *Biswell* (1972) 406 U.S. 311 [32 L.Ed.2d 87, 92 S.Ct. 1593] [search of business premises of licensed gun dealer]; *Wyman* v. *James, supra,* 400 U.S. 309 [home visits to welfare recipients]; *Colonnade Corp.* v. *United States* (1970) 397 U.S. 72 [25 L.Ed.2d 60, 90 S.Ct. 774] [search of liquor licensee's business premises]; *Terry* v. *Ohio, supra,* 392 U.S. 1 [stop and frisk]; *Camara* v. *Municipal Court, supra,* 387 U.S. 523 [health code inspections of private dwellings]; see also, *Almeida-Sanchez* v. *United States, supra,* 413 U.S. 266, 275-285 [37 L.Ed.2d 596, 604-610] (Powell, J., concurring) [searches of automobiles near international borders]; *United States* v. *Schafer* (9th Cir. 1972) 461 F.2d 856, cert. den. 409 U.S. 881 [34 L.Ed.2d 136, 93 S.Ct. 211] [screening search of airline passengers for quarantined plants and pests]; *Downing* v. *Kunzig, supra,* 454 F.2d 1230 [federal building screening search].

[5]Our conclusion as to whether probable cause or some functional equivalent is a constitutional prerequisite to a valid airport search may affect our analysis of the separate question whether prior judicial approval is required. (See *Almeida-Sanchez* v. *United States, supra,* 413 U.S. 266, 277 (Powell, J., concurring).)

[6]The demand for specificity and reliability in the information upon which searches and seizures are justified has been a central feature of our Fourth Amendment jurisprudence. (See *Sibron* v. *New York* (1968) 392 U.S. 40, 66-67 [20 L.Ed.2d 917, 936-937, 88 S.Ct. 1889]; *Terry* v. *Ohio, supra,* 392 U.S. 1, 21, fn. 18 [20 L.Ed.2d 889, 906]; *Aguilar* v. *Texas* (1964) 378 U.S. 108, 114 [12 L.Ed.2d 723, 728-729, 84 S.Ct.

by which we ordinarily *must* measure the reasonableness of searches and seizures. (*Chambers* v. *Maroney, supra,* 399 U.S. 42, 51; *Terry* v. *Ohio, supra,* 392 U.S. 1, 20; *Camara* v. *Municipal Court, supra,* 387 U.S. 523, 539 [18 L.Ed.2d 930, 941].) Thus, if the case at bar involved a "conventional" search and seizure by law enforcement officers engaged in the investigation of criminal activity, we would have to ascertain whether probable cause existed to justify the intrusion into constitutionally protected privacy. (*United States* v. *United States District Court, supra,* 407 U.S. 297, 322 [32 L.Ed.2d 752, 769]; *Terry* v. *Ohio, supra,* 392 U.S. 1, 20; *Camara* v. *Municipal Court, supra,* 387 U.S. 523, 539.)

It is now settled, however, that there is no fixed standard of reasonableness that applies to *all* types of governmental action which is subject to the mandates of the Fourth Amendment. Where, as here, we deal with a type of official conduct that (1) has objectives qualitatively different from those of the conventional search and seizure in the criminal context[7] and (2) cannot feasibly be subjected to regulation through the traditional probable cause standard of justification,[8] we may assess the reasonableness of the particular type of search and seizure by examining and balancing the governmental interest justifying the search and the invasion which the search entails. (See *United States* v. *Biswell, supra,* 406 U.S. 311; *Terry* v. *Ohio, supra,* 392 U.S. 1, 20-27 [20 L.Ed.2d 889, 905-909]; *Camara* v. *Municipal Court, supra,* 387 U.S. 523, 534-538 [18 L.Ed.2d 930, 938-941]; *Blair* v. *Pitchess, supra,* 5 Cal.3d 258, 270-273; Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349, 422; La Fave, *Administrative Searches and the Fourth Amendment: The Camara and See Cases* 1967 Sup. Ct. Rev. 1, 15-16.) Nevertheless, the notions which underlie the probable cause requirement remain "fully relevant." (*Terry* v. *Ohio, supra,* 392 U.S. 1, 20.) Accordingly, in focusing upon the governmental interest which allegedly justifies the official invasion of privacy, it is necessary to consider not only the nature and magnitude of the inter-

---

1509]; *Wong Sun* v. *United States* (1963) 371 U.S. 471, 479-484 [9 L.Ed.2d 441, 450-453, 83 S.Ct. 407]; *Brinegar* v. *United States* (1949) 338 U.S. 160, 175 [93 L.Ed. 1879, 1890, 69 S.Ct. 1302]; *Carroll* v. *United States* (1925) 267 U.S. 132, 159-162 [69 L.Ed. 543, 554-555, 45 S.Ct. 280, 39 A.L.R. 790]; *Director General* v. *Kastenbaum* (1923) 263 U.S. 25, 28 [68 L.Ed. 146, 147-148, 44 S.Ct. 52]; *Stacey* v. *Emery* (1878) 97 U.S. 642, 645 [24 L.Ed. 1035, 1036].)

[7]Of course, one of the general objectives of the particular type of search under scrutiny here is to detect criminal activity, i.e., the carrying of unauthorized weapons and explosives aboard airplanes. However, the overriding and more immediate interest is to prevent hijackings and thereby to save human lives and private property.

[8]It is clear that if airport officials are required to establish probable cause before subjecting any airline passenger to a screening search, few, if any, passengers could lawfully be searched.

est but also the suitability of predicating the government's right to search upon the existence of some functional equivalent of probable cause requiring a less demanding evidentiary showing. (*Almeida-Sanchez* v. *United States, supra,* 413 U.S. 266, 275-279 [37 L.Ed.2d 596, 604-606] (Powell, J., concurring); *United States* v. *United States District Court, supra,* 407 U.S. 297, 322-323 [32 L.Ed.2d 752, 769-770]; *Terry* v. *Ohio, supra,* 392 U.S. 1, 20-27; *Camara* v. *Municipal Court, supra,* 387 U.S. 523, 534-539 [18 L.Ed.2d 930, 938-941]; Greenberg, *supra,* 61 Cal.L.Rev. 1011, 1021-1022.)

FAA anti-hijack screening requirements were implemented to assure the uninterrupted and safe operation of our commercial air passenger transportation system. As the majority points out, the government has the most compelling reasons—the preservation of hundreds of lives and millions of dollars worth of private property—for subjecting airline passengers to a search for weapons and explosives which could be used to hijack an airplane.[9] Furthermore, the nature of the hijacking problem is such that there seems to be no practical means of limiting screening searches only to those passengers who are reasonably likely to hijack an airplane. (*United States* v. *Davis* (9th Cir. 1973) 482 F.2d 893, 907.) There is no solid basis for assuming that the "profile" screening procedure can succcessfully detect potential hijackers. (McGinley & Downs, *Airport Searches and Seizures—A Reasonable Approach* (1972) 41 Fordham L.Rev. 293, 305-306; but see Note, *Constitutionality of the 1973 Airport Searches: A Factual Analysis* (1973) 8 U.S.F. L.Rev. 172.) Since weapons or explosives can be taken aboard an airplane in anyone's clothing or "carry-on" baggage, the *only* screening procedure with an *acceptable* level of effectiveness is to subject each passenger to a magnetometer test and a carry-on baggage inspection. (See *United States* v. *Schafer, supra,* 461 F.2d 856, 858-859.)[10] Thus not only does the government have a compelling interest in screening passengers for weapons and explosives, but

[9]Of course, even the most compelling governmental interest may not in itself excuse noncompliance with the Fourth Amendment's warrant and probable cause requirements. Thus in *United States* v. *United States District Court, supra,* 407 U.S. 297, even the government's interest in protecting the nation against subversion and sabotage was not in itself sufficient to justify warrantless domestic national security wiretaps, and in order to secure a warrant for these wiretaps the government was required to show a functional equivalent of probable cause. (*Id.,* at pp. 311-324 [32 L.Ed.2d at pp. 762-770].) Therefore, in addition to the legitimacy and importance of the governmental objectives behind a particular type of search we also must examine the question whether the objectives can be accomplished with an acceptable degree of effectiveness if the government is required to obtain a warrant based upon probable cause or some functional equivalent prior to conducting the search.

[10]In *Schafer* the court concluded that *all* airline passengers leaving Hawaii were lawfully subject to a minimally intrusive pre-boarding screening search for prohibited plants and pests. The court reasoned that there was no effective means of detecting

also there is no available method by which screening officials could establish either "probable cause" or some lesser evidentiary justification for subjecting individual passengers to current screening procedures.

On the opposite side of the balance, we must examine "the nature and quality of the intrusion on individual rights" incidental to the governmental action under scrutiny. (*Terry* v. *Ohio, supra,* 392 U.S. 1, 24 [20 L.Ed.2d 889, 908].) We are not confronted here with an intrusion by governmental agents into the sanctity of the home as in *Camara* or the privacy of private commercial premises as in *See, Colonnade Corp.* and *Biswell.* Nor do we have even the "limited" indignity suffered by the individual who is stopped on the street by a police officer and frisked for weapons. (See *Terry* v. *Ohio, supra,* 392 U.S. 1, 24-27 [20 L.Ed.2d 889, 907-909].) Rather, we are presented here with a situation in which individuals go to a quasi-public facility the use of which is conditioned upon walking through a magnetic field and opening for inspection any packages or containers capable of holding weapons or explosives. Although there is an invasion of constitutionally protected privacy interests, the intensity and scope of the intrusion is clearly minimal. The magnetometer reveals to governmental scrutiny nothing other than the presence of metallic objects, and the carry-on baggage inspection is strictly limited in scope to that which is reasonably necessary to detect weapons or explosives. There are, moreover, additional considerations which operate to ameliorate the privacy intrusion incident to this very limited screening search.

Of signal importance is the fact that airline passengers have *advance notice* that they will be subjected to a pre-entry screening for weapons and explosives.[11] Although advance notice in itself cannot operate to deprive an individual of his Fourth Amendment rights, it nevertheless has been recognized by the courts[12] and commentators[13] as a factor of major sig-

---

which airline passengers were reasonably likely to be carrying the quarantined items and therefore probable cause was not required to justify a baggage search. In contrast, as one commentator has observed, "[T]he traditional probable cause test has not proved to be a bar to an acceptable level of criminal law enforcement. . . ." (La Fave, *supra,* 1967 Sup. Ct. Rev. 1, 16.)

[11]Signs prominently displayed at airports and the publicity given to airplane hijackings and governmental efforts to deal with the problem make it highly unlikely that potential airline passengers are unaware of airport screening procedures. (*United States* v. *Albarado* (2d Cir. 1974) 495 F.2d 799, 807-808; *United States* v. *Davis, supra,* 482 F.2d 893, 914.)

[12]*United States* v. *Biswell, supra,* 406 U.S. 311, 316 [32 L.Ed.2d 87, 92]; *Wyman* v. *James, supra,* 400 U.S. 309, 320-321 [27 L.Ed.2d 408, 415-416]; *United States* v. *Albarado, supra,* 495 F.2d 799, 807-808; *United States* v. *Miles, supra,* 480 F.2d 1217, 1219; *Barrett* v. *Kunzig, supra,* 331 F.Supp. 266, 274; see *Almeida-Sanchez* v. *United States, supra,* 413 U.S. 266, 270-271 [37 L.Ed.2d 596, 601-602].)

[13]Greenberg, *supra,* 61 Cal. L.Rev. 1011, 1029-1030; La Fave, *supra,* 1967 Sup. Ct. Rev. 1, 19-20, 34-35.

nificance in evaluating the extent to which individual privacy is compromised and intruded upon by governmental action. Advance notice enables the individual to avoid the embarrassment and psychological dislocation that a surprise search causes. For example, an airline passenger with advance notice of pre-boarding screening procedures can remove and place in his non-carry-on baggage any personal effects or other items which would cause him embarrassment if they were observed by airport officials conducting the screening inspection. Indeed, by the simple device of checking all baggage rather than carrying some aboard, an airline passenger traveling on domestic flights may transport all his baggage to his intended destination without any inspection of its contents. Advance notice, therefore, operates to diminish significantly the privacy intrusion incident to airport searches and acts as a counterbalance to the reduced level of Fourth Amendment protections surrounding such searches.

Another significant feature of public facility screening searches in general and airport searches in particular is the fact that the individual may elect not to be searched. The psychological impact upon the individual is considerably less where he has an option to avoid an intrusion upon his privacy than where, as in the conventional search, there is no choice but to submit to the invasion.[14] The potential airline passenger may avoid all intrusion into his privacy by foregoing traveling or by using a means of transportation other than the airplane and, as previously noted, even those who are compelled to fly by personal or commercial necessity may avoid the most intrusive facet of the screening procedure—the carry-on baggage inspection—by checking all such baggage with the remainder of their luggage.

Such an election not to be searched is admittedly at the cost of some inconvenience, particularly where alternate means of transportation are significantly more expensive or less efficient. Nevertheless, the fact that the individual may unilaterally opt to avoid all or a major portion of the screening search is a factor which renders the governmental action under scrutiny more "reasonable" within the meaning of the Fourth Amendment. (*Wyman* v. *James, supra,* 400 U.S. 309, 321, 324 [27 L.Ed.2d 408, 416, 417]; *United States* v. *Albarado, supra,* 495 F.2d 799, 807-808.)[15]

---

[14]The United States Supreme Court has recognized that the psychological impact of a governmental intrusion upon privacy is a factor which bears upon the reasonableness of the governmental action. Thus in *Camara* the court observed that health and fire inspections were generally welcomed by the public (*Camara* v. *Municipal Court, supra,* 387 U.S. 523, 537 [18 L.Ed.2d 930, 940]) and in *Terry* it was noted that a pat-down frisk was less "frightening" and "annoying" than a full-blown criminal search. (*Terry* v. *Ohio, supra,* 392 U.S. 1, 25 [20 L.Ed.2d 889, 908].)

[15]As the majority observes, it is axiomatic that searches conducted in the absence of probable cause must be strictly tied to and justified by the circumstances which

Finally, a third feature of public facility screening searches which operates to soften the impact of their intrusion upon individual privacy is the fact that all citizens who wish to use the particular facility involved are subject to the same screening procedures. No one is singled out for different treatment from his fellow travelers. There is no social stigma associated with airport screening inspections and the individuals who must submit to these searches do not run the risk of public ridicule or suspicion. Indeed, as the majority points out, most airline passengers welcome these limited searches as necessary safety precautions.

When all the salient features of airport screening searches are considered together—the very limited and circumscribed scope of the search, the advance notice of the screening procedures, the option to avoid the search altogether or at least the more intrusive carry-on baggage inspection, and the absence of any social stigma—it becomes apparent that the intrusion upon individual privacy is of very minor dimensions.

As previously noted, the reasonableness of the questioned governmental action is determined by balancing the need to search against the intrusion which the search entails. In the instant case the *conjunction* of the three relevant considerations—the compelling nature of the governmental interest, the lack of an effective means of limiting the screening search to those reasonably likely to hijack an airplane, and the very minor intrusion upon the privacy of airline passengers—persuades me that, on balance, current airport screening searches are "reasonable" despite the fact that they are conducted in the absence of probable cause or some functional equivalent.

At this juncture it bears repeated emphasis that this "balancing approach" to the resolution of the constitutional questions posed by airport searches does not in any manner lessen the overall protections of the Fourth Amendment nor signal a retreat from the fundamental principle that searches and seizures conducted in the absence of probable cause are per se unreasonable except in specifically enumerated contexts. The standards applicable to conventional searches and seizures remain unaltered. As

render their initiation permissible. (*Terry* v. *Ohio, supra,* 392 U.S. 1, 19, 26 [20 L.Ed.2d 889, 904, 908-909]; *People* v. *Collins* (1970) 1 Cal.3d 658, 662 [83 Cal. Rptr. 179, 463 P.2d 403].) The only justification for searching airline passengers for weapons and explosives is that such individuals are going aboard an airplane and might use a weapon or explosive to hijack the airplane. Thus a person who proceeds up to the point where the searches are being conducted must be permitted to elect not to be searched if he is willing to abandon his plans to board the airplane. Such individuals will not thereby be able to board another airplane unscreened because all passengers boarding all airplanes must undergo the same screening procedures. (Accord, *United States* v. *Albarado, supra,* 495 F.2d 799, 807-808; *United States* v. *Davis, supra,* 482 F.2d 893, 910-912.)

was stated by Mr. Justice White for the court in *Camara,* "Such an approach neither endangers time-honored doctrines applicable to criminal investigations nor makes a nullity of the probable cause requirement in this area. It merely gives full recognition to the competing public and private interests here at stake and, in so doing, best fulfills the historic purpose behind the constitutional right to be free from unreasonable government invasions of privacy." (*Camara* v. *Municipal Court, supra,* 387 U.S. 523, 539 [18 L.Ed.2d 930, 941].)

The conclusion that airport searches are justified or reasonable despite the absence of probable cause does not complete our analysis. Even searches which are otherwise reasonable may nevertheless be "unreasonable" within the meaning of the Fourth Amendment if government officials fail to secure a warrant authorizing the search. (*United States* v. *United States District Court, supra,* 407 U.S. 297, 314-324 [32 L.Ed.2d 752, 764-770]; *Vale* v. *Louisiana* (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969]; *Katz* v. *United States, supra,* 389 U.S. 347, 356-357 [19 L.Ed.2d 576, 585]; *Camara* v. *Municipal Court, supra,* 387 U.S. 523, 528-539 [18 L.Ed.2d 930, 935-941].) As the majority notes, however, since the warrant procedure would totally frustrate the legitimate governmental purpose of airport screening procedures, the failure to secure prior judicial approval does not render these searches unreasonable. (*Schmerber* v. *California* (1966) 384 U.S. 757, 770-771 [16 L.Ed.2d 908, 919-920, 86 S.Ct. 1826]; *Preston* v. *United States* (1964) 376 U.S. 364, 367 [11 L.Ed.2d 777, 780, 84 S.Ct. 881]; *Carroll* v. *United States, supra,* 267 U.S. 132, 153 [69 L.Ed. 543, 551]; see *Camara* v. *Municipal Court, supra,* 387 U.S. 523, 533 [18 L.Ed.2d 930, 937-938].) In addition, since there is no requirement of any level of probable cause for airport searches and since the time, place and scope of these searches are fixed by federal regulation, there is absolutely nothing for a neutral magistrate to pass judgment upon. In the context of airport searches, therefore, prior judicial approval is impractical if not impossible and would serve no purpose. It is thus not constitutionally required.

For the foregoing reasons I am of the opinion that although airport searches are conducted without either a warrant or probable cause, they do not run afoul of the Fourth Amendment's proscription against unreasonable searches and seizures and accordingly suffer from no constitutional defect. The screening search conducted in the instant case was properly confined to a magnetometer test and a carry-on baggage inspection, and the contraband observed in plain view in the course of this lawful search was constitutionally seized. (*Harris* v. *United States* (1968) 390

U.S. 234, 236 [19 L.Ed.2d 1067, 1069, 88 S.Ct. 992].) I concur with the majority's conclusion that the marshal acted lawfully and that the judgment be affirmed.

Tobriner, J., and Sullivan, J., concurred.