HENDRY, Judge.
The state appeals from an order suppressing evidence of narcotics trafficking obtained in preflight screening procedures at Miami International Airport.
The facts are there: Appellee Nadeau approached the inspection point at the Eastern concourse carrying two pieces of luggage, and submitted them for X-ray inspection; the X-ray weapons search was inconclusive, reflecting only that one bag’s contents were bulky and opaque; the X-ray operator informed Nadeau that she (the operator) would have to manually inspect the bag’s contents; Nadeau refused consent to do so, and offered instead to check the bag rather than carry it on board; the operator informed Nadeau that she was required by federal regulations to open the bag; over his objection, and after his removal from the inspection line by a police officer summoned to the scene by the operator, the bag was opened, and cocaine was discovered. We affirm.
Initially, we confront a necessary question not previously addressed in courts of this state, see Leavitt v. State, 369 So.2d 993 (Fla. 1st DCA), cert. denied 374 So.2d 101 (Fla.1979); Eisenman v. State, 320 So.2d 34 (Fla. 4th DCA 1975), cert. denied 336 So.2d 104 (Fla.1976), or in the United States Supreme Court: Is the preflight search process itself constitutionally permissible?
Courts considering the question have uniformly found preflight screening systems constitutional on one or more of four grounds: analogous to border search, Terry stop, consent, and administrative search. We consider each.
I. Border Search Analogy
In United States v. Skipwith, 482 F.2d 1272 (5th Cir. 1973), the Fifth Circuit held that, by virtue of the great need for pref-light search (analogous to the need for customs- and immigration-related border searches), and the limitedness of the intrusion, all those boarding a plane could, as in the border search instance, be constitutionally searched upon mere or unsupported suspicion. We need say no more than, without discussion of the validity vel non of border searches upon mere suspicion, that we emphatically reject importation of that standard into the context of domestic pref-light search; we find it totally inappropriate to require a choice between riding on a commercial airline and standing on a constitutional right. See Shapiro v. Thompson, 394 U.S. 618, 629-30, 89 S.Ct. 1322, 22 L.Ed.2d 600, 612-13 (1969). As the Skip-with opinion itself correctly points out, if necessity were the only criterion by which to assess the constitutional propriety of a search, house-to-house dragnet searches of high-crime neighborhoods would not be impermissible. While the Skipwith court seeks to foreclose such a result by reference to the degree of intrusiveness inherent in the search, we are not prepared to justify a search based on anything less than an artic-ulable suspicion, without reference to its intrusiveness.
II. Terry Stop
As a result of the foregoing statement, we consider the impact of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), upon preflight screening procedures.
The leading case justifying preflight search on Terry grounds is United States v. Lopez, 328 F.Supp. 1977 (E.D.N.Y. 1971). *184 There, Judge Weinstein decided for the court that a frisk by a U.S. Marshal, yielding not the expected weapon, but rather heroin, was constitutionally appropriate, because an articulable suspicion of criminal activity was validly raised in the officer’s mind: The suspects fit the anti-hijack profile, they had misidentified themselves, and the magnetometer had registered a metallic object larger than a twenty-five caliber pistol on each of their persons.
Assuming the validity of the Terry approach on Lopez’ facts, contra, People v. Hyde, 12 Cal.3d 158, 524 P.2d 830, 115 Cal. Rptr. 358 (Cal.1974), it seems clear nonetheless that Terry cannot provide support for the preflight procedure considered sub judi-ce. The Lopez court considered a selective system whereby those triggering the magnetometer and fitting the skyjacker profile were asked for identification by airline personnel; only those unable or unwilling to provide satisfactory identification were confronted by a U.S. Marshal; if the requisite identification was still not supplied, and the “selectee” denied the presence of metal on his person or in his carry-on luggage, and if thereafter the magnetometer indicated the presence of such metal (of greater magnetic deflective power than a twenty-five caliber pistol), the “selectee” was requested to submit to a pat-down search. Thus, only those initially meeting the profile requirements were subject to eventual designation as “se-lectees.” Since the 1973 amendment of the preflight search procedure, however, all passengers pass through magnetometers and submit to inspection of carry-on baggage, either by X-ray or physical search, without a particularized focus upon them by means of a profile or through inspection of identification. Indeed, Nadeau was detained, and his baggage was manually searched, on the basis of X-ray detection of unidentifiable shapes in his baggage-and on no other grounds. In short, there was no articulable suspicion that a crime was afoot, or that Nadeau possessed a weapon. See United States v. Davis, 482 F.2d 893 (9th Cir. 1973).[1]
III. Consent
The right to travel is constitutional in scope, Shapiro v. Thompson, supra, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600, as is the right to be free from unreasonable searches and seizures. Since one may not board a commercial flight without submitting to a search which is per se unreasonable (assuming no other constitutional justification rather than consent), he is forced to forego one constitutional right in order to enjoy another. It may be argued that travel by air is a privilege, and not a right; nevertheless, governmental conditioning of a privilege upon relinquishment of a constitutional right is itself unconstitutional. Frost v. Railroad Commission, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1926). Moreover, we note that a valid consent requires a clear and convincing showing of its being voluntarily made, Bailey v. State, 319 So.2d 22 (Fla.1975), and that voluntariness consists in more than acquiescence to a claim of lawful authority. Jordan v. State, 384 *185 So.2d 277 (Fla. 4th DCA 1980); Ingram v. State, 364 So.2d 821 (Fla. 4th DCA 1978); Mobley v. State, 335 So.2d 880 (Fla. 4th DCA 1976), cert. denied 341 So.2d 1085 (Fla. 1977). We cannot find consent in this setting, on these facts. Accord, United States v. Albarado, 492 F.2d 799 (2d Cir. 1974); United States v. Knoll, 481 F.2d 884 (8th Cir. 1973); United States v. Meulener, 351 F.Supp. 1284 (C.D.Cal.1972); United States v. Lopez, supra, 328 F.Supp. 1077; People v. Hyde, supra, 524 P.2d 830.
IV. Administrative Search
As pointed out in United States v. Davis, supra, 482 F.2d 893, 908, searches may be justified on the basis of furtherance of a valid administrative purpose, rather than as a search for evidence of crime. In this case, the administrative purpose lies in deterring skyjackers, and the concomitant smuggling aboard of weapons.
One important caveat should be stressed, however. To meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it. It follows that airport screening searches are valid only if they recognize the right of a person to avoid search by electing not to board the aircraft.
United States v. Davis, supra, 482 F.2d at 910.
It is here that the state’s ease fails. The initial search of his person and luggage may be justified only on the basis of an administrative search rationale, which is itself constitutionally bottomed on absence of unnecessary intrusion, in light of the administrative purpose (which is, as we have noted, avoidance of skyjacking incidents, rather than the obtaining of contraband or other evidence of criminal activity). The subsequent physical search of the bag was not justified by the administrative purpose: The bag could have been checked, and thus rendered inaccessible to Nadeau, without the need for a search. Or, had he so requested, Nadeau could properly, within the purpose of the procedure, have been allowed to leave the boarding area with his bag.
In so ruling, we are not unaware of decisions contra in United States v. DeAngelo, 584 F.2d 46 (4th Cir. 1978), cert. denied 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 493 (1979); United States v. Skipwith, supra, 482 F.2d at 1281 (Aldrich, J., dissenting, adopted by panel decision):
I do not accept defendant’s contention that, once he had reached the point of embarkation where inquiry and possible search procedures were openly in operation, he could choose to withdraw if he found the inquiry addressed to him not to his liking. United States v. Meulener, C.D.Cal., 1972, 351 F.Supp. 1284. The reasoning in Meulener, that if he then changed his mind, and elected to leave, “he would pose no danger to the passengers and crew on the aircraft,” 351 F.Supp. at 1289, greatly damages the prophylactic purpose of the search procedure. Such an option would constitute a one-way street for the benefit of a party planning airplane mischief, since there is no guarantee that if he were allowed to leave he might not return and be more successful. Of greater importance, the very fact that a safe exit is available if apprehension is threatened, would, by diminishing the risk, encourage attempts. Established search procedures are perhaps more valuable by what they discourage than by what they discover. I see no constitutional requirement, where a defendant knew by objective signs that he was incurring the possibility of a search, that he should thereafter be allowed to play heads-I-win, tails-you-lose.
That analysis was more persuasive when Skipwith was written; then, the more selective screening procedures were in use. The less intrusive pre-1973 process was far less certain to cull all potential skyjackers from the passenger list of each flight than is the present random-pervasive system:
It is difficult to see how the need to prevent weapons and explosives from being carried aboard the plane could justify the search of a person who had elected *186 not to board. Perhaps it could be argued that a compelled search might lead to the apprehension of a potential hijacker, eliminating or at least reducing the chance that he would try again. Compared to the degree of additional intrusiveness that compulsory searches involve, however, this possibility seems so slight as to be inconsequential. The risk of successful hijacking is not enhanced by allowing a potential passenger to avoid a search on a particular occasion by electing not to fly. Airport screening searches, as carried out in this case and as currently employed nationwide, are not selective. A prospective passenger who elects not to fly on an earlier flight is, like all other passengers, certain to be subjected to a search before he can board a later flight.
It is significant that the regulations establishing the airport search program do not authorize or require compelled searches.
Since a compelled search of persons who elect not to board would not contribute to barring weapons and explosives from the plane, it could serve only the purpose of apprehending violators of either the criminal prohibition against attempting to board an aircraft while carrying a concealed weapon ... or some other criminal statute. Such searches would be criminal investigations subject to the warrant and probable cause requirements of the Fourth Amendment.
In sum, airport screening searches of the persons and immediate possessions of potential passengers for weapons and explosives are reasonable under the Fourth Amendment provided each prospective boarder retains the right to leave rather than submit to the search.
United States v. Davis, supra, 482 F.2d at 911-12. (citation, footnotes omitted).
We find this reasoning compelling, and we adopt it. Thus, unless the manual search of Nadeau’s luggage was made with at least a founded suspicion of criminal activity and the presence of weapons, United States v. Dalpine, 494 F.2d 374 (6th Cir. 1974), it was invalid. Further, we find that the presence of unidentified bulky objects in his luggage, without more, could not justify a Terry stop. The officials might have properly refused to allow the bag to accompany Nadeau on board, but they were not entitled to open it over his objection.
We therefore affirm the suppression order of the trial court.
Affirmed.

. Assuming arguendo that the unidentifiability of the object in his baggage created an articula-ble suspicion, it was itself the product of a search: The search by X-ray, to meet the Terry requirement, must have been undertaken with the requisite founded suspicion, which it obviously was not. We stress that the unidentifia-bility of the object was assumed to raise a founded suspicion only for the purpose of analysis.
We note that the Lopez court apparently felt that meeting the profile requirements was itself a sufficient indicium of criminal activity and the presence of a weapon to raise the requisite articulable suspicion thereof; passage through the magnetometer-the required first step-seems itself to be a search, presumably requiring such preexisting suspicion. The court may have alluded to the question, when it commented, 328 F.Supp. at 1100:
We do not now decide whether, in the absence of some prior indication of danger, the government may validly require any citizen to pass through an electronic device which probes beneath his clothing and effects to reveal what he carries with him.
If Lopez indeed stands for the proposition that meeting the skyjacker profile requirements satisfies the Terry requirement of founded suspicion, we are forced to reject it, by our rejection of the same contention in the context of the drug-currier profile in Royer v. State, 389 So.2d 1007 (Fla. 3d DCA 1980).