[Civ. No. 32909. First Dist., Div. Four. Jan. 13, 1975.]

RONALD JOSEPH MORAD, Petitioner, v.
THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Howard J. Berman and Jeffry Glenn for Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, Doris H. Maier and Edward P. O'Brien, Assistant Attorneys General, W. Eric Collins, Richard Tullis and Nancy S. Reller, Deputy Attorneys General, for Real Party in Interest.

## OPINION

**CALDECOTT, P. J.**—Petitioner, Ronald Morad, is charged with possession of restricted dangerous drugs (LSD tablets) in violation of Health and Safety Code section 11910. The Superior Court of San Mateo County denied his motion to suppress the dangerous drug evidence (Pen. Code, § 1538.5), and from that order petitioner seeks a writ of prohibition.

In *People* v. *Hyde,* 12 Cal.3d 158 [115 Cal.Rptr. 358, 524 P.2d 830], the court held that the preboarding airport search made for the purpose of discovering weapons and explosives and deterring hijackers was not in violation of the Fourth Amendment to the United States Constitution. The court further held that the incidental discovery of contraband during

the course of the search did not violate the Fourth Amendment. In *Hyde,* the defendant was a boarding passenger at the time of the search. In the instant case, the petitioner, after the initiation of the search, but prior to the discovery of the contraband, elected not to board the airplane and asked to leave. The issue thus presented is whether the pat-down search of petitioner's person for weapons was justified by the fact that he met the hijacker profile and set off the magnetometer, even though petitioner had offered to leave the boarding area and not board the plane.

United States Customs Security Officer Michael La Rochelle testified that on December 2, 1972, he was assigned to Gate 66 of Pier F, San Francisco International Airport in connection with the anti-hijacking program. He was assisted by another customs officer, Officer Taylor. There were two signs posted in the area indicating that passengers boarding aircraft were subject to search; one at the ticket counter, and one directly at the door entering the jetway.

The airlines agent signaled Officer La Rochelle that petitioner met the F.A.A. hijacker profile. Petitioner passed through the magnetometer and activated it. He was then asked by Officer La Rochelle if he could look through his bags (a brown paper bag and a briefcase). Petitioner replied, "[s]urely." The officer then searched the bags.

The officer then asked petitioner to walk through the magnetometer a second time without his bags. Petitioner complied and again activated the magnetometer.

When asked if he had any metal on his person, petitioner removed his watch and belt and passed through the magnetometer a third time. Again he activated the magnetometer.

At this point Officer La Rochelle asked petitioner "[d]o you mind if this officer [referring to Officer Taylor] gives you a pat-down search?" There is a conflict in the evidence as to whether the petitioner consented; however, the trial court found that he did not consent to the search. The question of consent to the search, however, is immaterial.[1] Officer Taylor

---

[1]As stated in *People* v. *Hyde, supra,* 12 Cal.3d at page 162, footnote 2: "In any event, the consent theory is inappropriate. Consent, to be valid, must be free and voluntary. (*Bumper* v. *North Carolina* (1968) 391 U.S. 543, 548 . . . .) The court in *United States* v. *Kroll* (8th Cir. 1973) 481 F.2d 884, 886, pointed out that 'Compelling the defendant to choose between exercising Fourth Amendment rights and his right to travel constitutes coercion; the government cannot be said to have established that the defendant freely and voluntarily consent [*sic*] to the search when to do otherwise would have meant foregoing the constitutional right to travel.' "

performed a pat-down search. When conducting the pat-down, Officer Taylor felt one "lump" in each of petitioner's boots. He described them as moderately hard and located at the back of each boot. The lumps were moveable. It was clear that there was something unusual in the boots. He thought it could be a weapon. Each lump turned out to be a baggie packed with 1,000 LSD tablets.

Petitioner described his condition at this point as "[v]ery upset and nervous." He stated that he said: "Look, I've got no weapons on me. If you don't let me on I won't ride." It was at this point that Officer La Rochelle conducted the search.

In *People* v. *Hyde, supra,* 12 Cal.3d 158, contraband was seized from the defendant's shaving kit which airport authorities searched after defendant set off the magnetometer. The Supreme Court upheld the airport search under the administrative search doctrine as stated in such cases as *Camara* v. *Municipal Court,* 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727]; *United States* v. *Biswell,* 406 U.S. 311 [32 L.Ed.2d 87, 92 S.Ct. 1593]; and *See* v. *City of Seattle,* 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737]. (*People* v. *Hyde,* at p. 165.)

In reaching its decision the court explicitly rejected the argument, adopted by courts in many other jurisdictions, that such searches were justified under *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]. (*Hyde,* at p. 162, see fn. 3.)

In the words of the court, *Terry* v. *Ohio* "upheld a search undertaken without either a warrant or probable cause on the ground that the governmental interest in the protection of law enforcement officers, on balance, so outweighed the interest of the individual in being free from official intrusion of minimal scope as to satisfy the Fourth Amendment requirement of reasonableness." (*People* v. *Hyde, supra,* 12 Cal.3d at pp. 162-163.)

The court in *Hyde* stated that even though an individual satisfied the F.A.A. "hijacker profile" and activated the magnetometer, the officer who performs the pat-down could not meet the *Terry* requirement that he perform a search only upon " 'specific and articulable facts' which would warrant 'a reasonably prudent man in the circumstances . . . in the belief that his safety or that of others was in danger.' (392 U.S. at pp. 21, 27 [20 L.Ed.2d at pp. 906, 909].)" (12 Cal.3d at p. 163.) The court based this conclusion on the fact that only 6 percent of those passengers who met the "hijacker profile" and activate the magnetometer were likely to

be found with a weapon, and that this small percentage could not justify a reasonably prudent officer in the belief that the individual was "armed and dangerous." (*Id.* at p. 164.)

The court further found that since screening by a magnetometer is itself a search within the meaning of the Fourth Amendment, "justification of the ultimate search under *Terry* on the basis of a magnetometer reading would constitute boot-strapping to an impermissible degree." (12 Cal.3d at p. 164.) The court continued, "[i]f the magnetometer is to be relied upon as a ground for a search, it must itself first be legitimated under the Fourth Amendment." *(Id.)* As noted above, the court found this legitimacy in the administrative search doctrine, and approved "a pre-departure screening of all passengers and carry-on baggage sufficient in scope to detect the presence of lethal weapons or explosives . . . ." (12 Cal.3d at p. 167.)

Thus, the magnetometer screening of petitioner Morad was clearly justified under *Hyde*. It also seems clear that, had Morad not stated his change of mind about boarding the plane, but had expressed a continuing intent to board, the officers were not only justified, but required to search him for weapons. Morad had set off the magnetometer three times after relinquishing his bags; it continued to detect metal on his person even after the removal of his pocket watch, spare change, and belt buckle. The pat-down performed by Officer Taylor was therefore necessary "to detect the presence of lethal weapons or explosives . . ." and once he felt the hard bumps in Morad's boots, a search of the boots for weapons or explosives was also necessary.

■  Morad, however, expressed his intention not to board the plane, and his wish to leave the boarding area, before the pat-down was performed. He contends that since he no longer intended to board the plane, a search of his person for hijacking weapons was unreasonable. We disagree.

It is contended that *Hyde* precludes a search of an individual, even one who meets the profile and activates the magnetometer, who, when confronted with the threat of a pat-down search, elects to leave the boarding area. The court in *Hyde* stated that one safeguard against the undesirable consequences of warrantless airport searches was that "airport screening procedures must be as limited in intrusiveness as is consistent with their justification, and *an individual may avoid submitting to a search altogether by electing not to board the airplane." (Id.* at p. 169.) (Italics added.) We think this language is correctly interpreted as stating

that a prospective passenger may opt not to go through *any* of the screening procedures by forfeiting the opportunity to travel by airplane. It is difficult to believe that the court envisioned that an individual who passed through the screening procedures, which procedures suggested he might be carrying weapons or explosives, could *then* avoid further search by electing not to board the plane. Such an individual could then go to another boarding area and try again to board another plane, secure in the knowledge that if and when the suspicion of the authorities was aroused, he could avoid a search there by stating that he had decided not to board.

The court in *Hyde* stated that "pre-departure screening procedures are . . . designed to insure that dangerous weapons will not be carried onto an airplane and to deter potential hijackers from *attempting* to board." (*Id.* at p. 166.) (Italics added.) The crucial word here is "attempting." As noted above, the knowledge that one could avoid a search by a last-minute change of mind would allow the potential hijacker to "magnetometer shop" until he found a boarding area through which he could pass undetected.[2]

The court in *Hyde* stated that "[i]n upholding airport screening procedures because of their regulatory nature, we recognize that '[t]he scope of the search must be "strictly tied to and justified by" the circumstances which rendered its initiation permissible.' [Citations.]" (*Id.* at p. 168.) The circumstances which render the magnetometer screening permissible as a regulatory measure are the high incidence of air piracy and the lack of an "unerringly accurate procedure . . . to restrict

---

[2]See *United States* v. *Skipwith* (5th Cir. 1973) 482 F.2d 1272 disapproving *United States* v. *Meulener* (C.D.Cal. 1972) 351 F.Supp. 1284, which had upheld the right of the passenger to avoid a search by choosing not to board the plane. The dissenting opinion of Aldrich, J., at page 1281, expressly approved by the majority at page 1277, states: ". . . I do not accept defendant's contention that, once he had reached the point of embarkation where inquiry and possible search procedures were openly in operation, he could choose to withdraw if he found the inquiry addressed to him not to his liking. United States v. Meulener, C.D.Cal., 1972, 351 F.Supp. 1284. The reasoning in *Meulener*, that if he then changed his mind, and elected to leave, 'he would pose no danger to the passengers and crew on the aircraft,' 351 F.Supp. at 1289, greatly damages the prophylactic purpose of the search procedure. Such an option would constitute a one-way street for the benefit of a party planning airplane mischief, since there is no guarantee that if he were allowed to leave he might not return and be more successful. Of greater importance, the very fact that a safe exit is available if apprehension is threatened, would, by diminishing the risk, encourage attempts. Established search procedures are perhaps more valuable by what they discourage than by what they discover. I see no constitutional requirement, where a defendant knew by objective signs that he was incurring the possibility of a search, that he should thereafter be allowed to play heads-I-win, tails-you-lose."

pre-departure searches only to those who are potential hijackers." (*Id.* at p. 167.) The practice of conducting a pat-down search of one who has repeatedly activated the magnetometer even after removal of much visible metal from his body, rather than to turn him loose in the airport, possibly in possession of weapons or explosives, is in conformity with the purpose of the regulatory search.

The alternative writ of prohibition is discharged, and the writ is denied.

Rattigan, J., and Christian, J., concurred.