[Crim. No. 15290. First Dist., Div. One. Dec. 3, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANCINE ELAINE DOOLEY, Defendant and Appellant.

**COUNSEL**

Cooper, Newhouse, Hertz & Lyons, Howard Hertz and Sandra Smith for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ELKINGTON, J.**—Defendant Francine Elaine Dooley's appeal is from an order granting probation, following her plea of guilty to possession of a controlled substance for sale (Health & Saf. Code, § 11378).

For the reasons which we now state, the appeal is found to be without merit and the order granting probation will be affirmed.

The appeal concerns the validity of a Federal Aviation Administration ("F.A.A.") flight security regulation. The regulation authorized a non-consensual search of a commercial airline traveler's previously checked-in luggage, following an anonymous telephone warning of a bomb on the airplane in which the luggage had been stowed, even though the passenger elected to forego the flight and depart with the unexamined luggage.

The relevant facts are uncontroverted.

The passengers of United Airlines flight 136 had boarded the airplane at San Francisco International Airport after submitting to a magneto-meter and hand-luggage search required by F.A.A. security regulations. The plane, with a passenger and crew capacity of about 250, was taxiing to an airport runway when an anonymous telephone call to the airline's security officer said: "[O]n that Flight 136 to Chicago, 'It got a bomb on it.'" Immediately law enforcement officers and appropriate company personnel were alerted and administrative precautions of the F.A.A. were placed in effect.

In accordance with these regulations the airplane was taken to a relatively isolated point on the airfield. The passengers were disembarked and their stowed baggage unloaded and placed on "search tables which had been set up by United Air Lines' personnel . . . ." The bomb warning and the procedures were explained to the passengers, who in small groups were asked to identify their bags. As each lot of luggage was searched in the presence of its owners and found "sterile," it was placed to one side for reloading on the airplane. The search was conducted by "the captain from that particular flight, stewardesses and stewards from that flight, United Air Lines supervisors, and deputy sheriffs," to whom the passengers generally had identified their luggage and, as necessary, furnished keys.

Toward the end of the search procedure Ms. Dooley, one of the passengers, was asked about her luggage. She pointed out two bags, and said that she wished them returned to her since she had decided not to continue with the flight and desired to leave the airport with her bags unopened. She was again advised of the bomb warning and of the required routine F.A.A. security procedures. She was asked to accompany a deputy sheriff with her luggage, which "was going to be searched by United Air Lines personnel and the sheriff's personnel."

Ms. Dooley's luggage was then placed in a "protective bomb cart" with a "roof and three metal sides," and taken to an even more remote place, a hangar-type building, away from the other passengers. Asked for the bags' keys, Ms. Dooley replied that she didn't think she had them. She then "began looking for the key, emptying most of her purse and wasn't able to find it. She said, 'I guess I don't have the key. I lost it.' " A United Airlines official then unlocked the bags with a master key. With other people standing back, a deputy sheriff "slowly" opened one of the bags. There was "a box in there covered with a bluish-silver-type wrapping paper with numerous items of clothing wrapped around it securing it from—as if securing it from touching the sides of the suitcase." The box was heavy; "it appeared to . . . weigh fifteen or twenty pounds." It was even more carefully opened. The officer testified that because of "the possibility of it containing a bomb"—"I continued doing this in the presence of Miss Dooley and my partner Deputy Radojevich. It took some time, about two minutes. I did it very slowly removing —once cutting the paper all the way around—removing it and finding that there did not appear to be any particular type of wires along the side of the box, and then removed and tore the paper back."

Upon removal of its cover, the box was found to contain approximately 81,000 PCP (Phencyclidine) pills, a controlled substance. (See Health & Saf. Code, § 11056, subds. (a), (b)(8).) In the other bag was found a similar heavy box which also contained approximately 81,000 PCP pills. Ms. Dooley had not consented to the search. She was arrested for transportation (Health & Saf. Code, § 11379), and possession for sale (Health & Saf. Code, § 11378), of controlled substances.

Ms. Dooley's motions to suppress evidence of the contraband under Penal Code section 1538.5 were successively denied by a magistrate and the superior court. Her subsequent plea of guilty was to a charge of possessing, for sale, the contraband found in the search.

 The issue presented for our determination is whether the administrative search of Ms. Dooley's luggage was permissible according to the Fourth Amendment.

 Our principal guide is a recent decision entitled *People* v. *Hyde,* 12 Cal.3d 158 [115 Cal.Rptr. 358, 524 P.2d 830], where the state's Supreme Court undertook to interpret and reconcile pertinent federal authority on the subject. Its definitive holdings "are binding upon and

must be followed by all the state courts of California." (*Auto Equity Sales, Inc.* v. *Superior Court*, 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

*Hyde* also concerned F.A.A. administrative regulations designed to prevent hijackers and other terrorists from placing weapons and bombs aboard aircraft of commercial airlines. The regulations had determined the "behavioral profile of a potential hijacker," and required all passengers to submit to a magnetometer test for metal upon their persons, and an examination of the contents of their carry-on hand luggage.

Hyde, seeking passage on a Western Airlines plane, appeared to possess the hijacker "profile" and he "activated a magnetometer indicating the presence of metal." A federal deputy marshal asked him to place his hand luggage on a table. Upon the opening of a bag the officer observed a shaving kit and explained to Hyde that the contents of such a container often triggered the magnetometer. The kit was opened, disclosing a quantity of marijuana which became the subject of Hyde's prosecution and conviction. On his appeal he made a contention similar to that now before us.

Citing extensive authority, q.v., the *Hyde* court first stated "that 'searches conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime, may be permissible under the Fourth Amendment though not supported by a showing of probable cause directed to a particular place or person to be searched.'" (12 Cal.3d, p. 165.)

But the court nevertheless held that—"Like all searches subject to the Fourth Amendment, an administrative screening must be measured against the constitutional mandate of reasonableness." (12 Cal.3d, p. 166.) A prime consideration in determining the reasonableness of such regulations was the profound public interest in preventing hijacking and destruction of airplanes, and in the safety of their passengers and crew. But nevertheless the court held reasonableness to require that such administrative "inspections must be confined to minimally intrusive techniques designed solely to disclose the presence of weapons or explosives." (12 Cal.3d, p. 168.) And the court said, if "the initial intrusion is justifiable as part of a regulatory effort to prevent the

hijacking of airplanes, the incidental discovery of contraband does not offend the Fourth Amendment." (12 Cal.3d, p. 166.)

Weighing the "gravity of the governmental interest involved," against what it found to be the *minimal intrusion* of an air passenger's baggage search, *Hyde* declared that the F.A.A. regulation before it "cannot be viewed as unreasonable." (12 Cal.3d, p. 167.) The search of Hyde was found to be constitutionally proper, and his conviction was affirmed.

Three of the justices, concurring in *Hyde,* were also in agreement "that the FAA anti-hijack screening procedures currently in effect suffer from no constitutional infirmity." (12 Cal.3d, p. 170.) But these members of the court opined that the lawfulness of Hyde's search need not depend upon the so-called "administrative search doctrine." (12 Cal.3d, p. 170.) They preferred that the decision rest upon "the principles underlying the delicate balancing process which lies at the heart of a small but significant segment of our Fourth Amendment jurisprudence. This balancing process [they said] focuses on the Fourth Amendment's standard of reasonableness . . . ." (12 Cal.3d, p. 171; fn. omitted.) Applying this balancing test, under all of the facts and circumstances of the case, they too found the search of Hyde to have been reasonable.

It will be seen that the entire *Hyde* court were in agreement that the validity of an airline passenger search, like all searches, "must be measured against the constitutional mandate of reasonableness" (maj. op., 12 Cal.3d, p. 166), and determined by " 'the essential Fourth Amendment inquiry into the "reasonableness" of the search and seizure in question, . . .' " (Conc. opn., 12 Cal.3d, p. 172.) "Reasonableness" will be determined by weighing the extent of the intrusion into the passenger's privacy against "the gravity of the governmental interest involved" (maj. opn., 12 Cal.3d, p. 167), and by "balancing the governmental interest justifying the search and the invasion which the search entails" (conc. opn., 12 Cal.3d, p. 173).

In their determination that the search of Hyde was reasonable, the *Hyde* court pointed out that "most airline passengers welcome these limited searches [for weapons and explosives] as necessary safety precautions." (12 Cal.3d, p. 177.) The court also found the intrusion "clearly minimal" where a passenger goes "to a quasi-public facility the use of which is conditioned upon walking through a magnetic field and

opening for inspection any packages or containers capable of holding weapons or explosives." (12 Cal.3d, p. 175.)

But we nevertheless observe that one seeking air passage, and faced with the requirement of a personal or luggage search before acceptance for the flight, may ordinarily avoid the search by electing not to board the airplane. (*People* v. *Hyde, supra,* 12 Cal.3d 158, 169; and see *United States* v. *Davis,* 482 F.2d 893, 911.)

The F.A.A. regulations and the balancing process of *Hyde* make no distinction between the placing of weapons, and explosives, aboard a commercial airlines plane. Indeed, if a distinction were to be drawn it would reasonably be concluded that explosives were the greater threat, for their use during flight would ordinarily destroy the airplane and all its passengers, while a weapon's use ordinarily would not.

The narrower question before us concerns a person who has elected to make a particular airline flight, has checked luggage aboard it, has submitted to a magnetometer test and examination of hand-carried containers, if any, and has boarded the plane. In such a context, upon an anonymous warning that a bomb has been placed aboard the plane, is the F.A.A. requirement that *all luggage* be removed from the plane and subjected to a limited search for explosives constitutionally valid? Or, in such a case, does the passenger have a constitutional right to retrieve without such inspection luggage which had been checked and stowed aboard the aircraft, by electing not to continue with the flight?

These questions, we opine, have been answered by the following authority.

*Morad* v. *Superior Court,* 44 Cal.App.3d 436 [118 Cal.Rptr. 519]. Here the court held that by electing to submit to *any* of an airline's F.A.A. security screening measures, a prospective passenger thereby, as a matter of law, has in effect waived objection to further reasonable administrative searches of his person or luggage. Morad, seeking passage on a commercial airline, had "flunked" the hijacker profile test, and a magnetometer search. When an officer indicated an intent to "pat search" him Morad objected and expressed an intent not to board the plane, and instead to leave the airport. He was nevertheless searched for weapons, and the search disclosed a quantity of LSD tablets. The weapons search and the consequent "plain sight" seizure of the

contraband were found to be constitutionally proper. The *Morad* court interpreted *Hyde,* we think correctly, as follows:

"It is contended that *Hyde* [12 Cal.3d 158] precludes a search of an individual, even one who meets the profile and activates the magneto-meter, who, when confronted with the threat of a pat-down search, elects to leave the boarding area. The court in *Hyde* stated that one safeguard against the undesirable consequences of warrantless airport searches was that 'airport screening procedures must be as limited in intrusiveness as is consistent with their justification, and *an individual may avoid submitting to a search altogether by electing not to board the airplane.*' (*Id.* at p. 169.) (Italics added.) We think this language is correctly interpreted as stating that a prospective passenger may opt not to go through *any* of the screening procedures by forfeiting the opportunity to travel by airplane. It is difficult to believe that the court envisioned that an individual who passed through the screening procedures, which proce-dures suggested he might be carrying weapons or explosives, could *then* avoid further search by electing not to board the plane. Such an individual could then go to another boarding area and try again to board another plane, secure in the knowledge that if and when the suspicion of the authorities was aroused, he could avoid a search there by stating that he had decided not to board." (44 Cal.App.3d, pp. 440-441.)

*United States* v. *Legato,* 480 F.2d 408 (cert. den., 414 U.S. 979 [38 L.Ed.2d 223, 94 S.Ct. 295]). There an anonymous telephone caller said that someone carrying a bomb in an orange-colored shopping bag would attempt to board a certain airline flight. Police authorities soon observed two men, one of whom was carrying such a bag, and who upon hearing a loudspeaker bomb alarm, started to leave the airport terminal. Although without probable cause, at least in the traditional sense, the suspect was stopped and the bag was searched. It disclosed contraband but no bomb. In justification of the search the court reviewing said: "The circum-stances then facing the investigating officers left only two available courses of action. One was to make an investigative stop long enough in duration to allow an inquiry into the possibility of criminal behavior. The other was to do nothing, thus letting Migdall [who carried the bag] escape with the possible consequence that he and Legato [his compan-ion] would only be thwarted temporarily in their plans. Given the current threat to public safety posed by air piracy as well as the inherent destructive potential of a bomb, it is inconceivable to us that the officers would choose the latter alternative. Under the circumstances, it was clear

that with only minimal inconvenience to all concerned, a brief stop and inquiry into the contents of the shopping bag [i.e., its search] could quickly and conclusively resolve what appeared to be an extraordinarily dangerous situation. In our opinion, the stopping of Legato and Migdall is clearly sanctioned by [authority]. . . . Adherence to the commands of the fourth amendment, as the Supreme Court has said, does not mean that a law enforcement official must 'simply shrug his shoulders and allow a crime to occur or a criminal to escape.' Adams v. Williams, *supra*, 407 U.S. at 145-146, 92 S.Ct. at 1923, 32 L.Ed.2d at 616, 617. [¶] . . . Moreover, we think that [the officer's] decision to search the package at that point was demanded by the sheer urgency of the situation. Not only did [he] have his own safety to consider but the safety of many others in the vicinity who might be killed or injured if a bomb was detonated was involved as well." (480 F.2d, pp. 411-412; fn. omitted.)

*United States* v. *Cyzewski*, 484 F.2d 509. Discussing an issue similar to that here at hand, that court commented as follows: "Airport security measures are reasonable, therefore, insofar as they permit government agents to determine whether a suspect presents an immediate danger to air commerce. The search may continue until the law enforcement official satisfies himself that no harm would come from the passenger's boarding the plane. To be effective, the security efforts must focus not on a single aircraft or tangible item, but on the suspect himself, his demeanor and possessions during the entire course of his airport presence. The marshal's duty is to make a trained judgment, as expeditiously as possible, regarding the threat posed by an individual identified by the behavioral profile. Only when it becomes unreasonable for the suspect's innocence to be further questioned does the security search itself become unreasonable. [¶] The question is whether the retrieval of checked baggage and the warrantless search of it over protest is consistent with this principle. [¶] We sustain the search because at no point in the authorized security procedure did defendants' innocence become clear to the marshals." (484 F.2d, pp. 513-514; fn. omitted.)

We think the reasonableness of a search such as that of Ms. Dooley's luggage may otherwise be demonstrated.

In the determination of such reasonableness, an important consideration would be the fact that, as here, the questioned luggage no longer posed a threat to the airplane from which it was removed, or to the airplane's passengers and crew. But sometimes, as in the case at bench,

another consideration exists; to some degree, *although perhaps slight,* the initial anonymous warning will acquire added credibility. Rather than suffer a baggage search, a passenger will elect to cancel his or her flight plans. Although, as we have emphasized, the *probability* that the luggage contains explosives may be slight, the awesome *possibility* that it does must, in such a case, be weighed against the "minimal intrusion" sought to be avoided. Surveys available to *Hyde* "indicated only 1 out of every 15 passengers who both fit the profile and set off a magnetometer was likely to be found with a weapon." (12 Cal.3d, p. 164.) Were we to speculate that the probability of the reported bomb being in the reluctant passenger's luggage was but 1 out of 150, or 1,500, or whatever figure, the odds might nevertheless reasonably be considered unacceptable.

Although the threat posed that day to United Airlines "Flight 136 to Chicago" by Ms. Dooley's luggage had abated, a profound public concern about the luggage's contents remained. It seems a near certainty, or at least a strong probability, as suggested in *Morad* v. *Superior Court, supra,* 44 Cal.App.3d 436, 441, that one in Ms. Dooley's position would promptly seek other air transportation for herself and her luggage, this time on a plane concerning which there had been no bomb warning. And the possibility would also exist that the luggage would be placed in a locker or elsewhere in the airport with tragic results, such as the world has recently witnessed.

Other evidence points to the reasonableness of the search of Ms. Dooley's luggage. The search was obviously undertaken in good faith compliance with the F.A.A. administrative regulations. She had not been singled out for different treatment from her fellow travelers. As said in *Hyde*: "There is no social stigma associated with airport screening inspections and the individuals who must submit to these searches do not run the risk of public ridicule or suspicion. Indeed, as the majority points out, most airline passengers welcome these limited searches as necessary safety precautions." (12 Cal.3d, p. 177.) And the search was not an arbitrary decision of an airline or police official. The intrusion upon Ms. Dooley's privacy was "clearly minimal" as in *Hyde*; it did not differ from the thousands of hand-luggage, and customs, searches made daily in the nation's airports. ■ The opening of the box within the first piece of luggage was not unduly intrusive, for its weight and appearance were consistent with the possibility that it contained explosives. Observation, and seizure, of the contraband which then appeared in "plain view," was proper. (*People* v. *Block,* 6 Cal.3d 239, 243 [103 Cal.Rptr. 281, 499 P.2d

961].) The continuing bomb threat, and the probable cause furnished by discovery of the first quantity of PCP, clearly authorized the search of Ms. Dooley's other bag.

■ Nor does the fact that the subject security procedures were commenced by an "unreliable" anonymous telephone call render the instant search unreasonable. As said in *United States* v. *Legato, supra,* 480 F.2d 408, 412: "[I]t is of no consequence to the result reached in this decision [to make an airport security search of luggage] that an anonymous tip triggered the chain of events leading up to . . . the protective search of the package for explosives." And search warrants have been ruled wholly inappropriate in the context of an airport security search. "[S]ince the warrant procedure would totally frustrate the legitimate governmental purpose of airport screening procedures, the failure to secure prior judicial approval does not render these searches unreasonable." (*People* v. *Hyde, supra,* 12 Cal.3d 158, 178.)

It may also reasonably be said that the F.A.A. regulations here at issue are in aid, rather than in derogation, of the constitutional "right to travel." (See *Kent* v. *Dulles,* 357 U.S. 116, 125-127 [2 L.Ed.2d 1204, 1209-1211, 78 S.Ct. 1113].) "In a broad sense, the airport search program is a governmental effort to protect freedom to travel from private interference, rather than to impede the individual's right to travel." (*United States* v. *Davis, supra,* 482 F.2d 893, 913, fn. 59.)

■ We are of course cognizant of the frequently expressed rule requiring reasonable advance notice of an airport magnetometer and hand-luggage search, thus enabling a traveler to forego his planned air passage rather than submit to the search. (See *People* v. *Hyde, supra,* 12 Cal.3d 158, 175.) This is obviously an important consideration in determining a security search's reasonableness. Although advance notice of a magnetometer and hand-luggage search before boarding is obviously reasonable, we would question the reasonableness and wisdom of an F.A.A. regulation requiring that the traveling public generally be advised that any anonymous telephone report of a bomb would result in airline disruption, delays and baggage searches such as occurred in this case. This widespread notice would reasonably be calculated to invite such interference by malicious persons, or pranksters, or as suggested by Ms. Dooley, "kooks." The F.A.A. could reasonably, and presumably did, conclude that public notice of the consequence of the now relatively infrequent bomb reports was unwise, and unreasonable. We opine also

that such notice is not necessarily required in order to establish the reasonableness of a luggage search such as is here at issue, particularly where the subject has already acquiesced in the magnetometer and hand-luggage search procedures, of which due notice had been given.

The order granting probation is affirmed.

Molinari, P. J., and Weinberger, J.,* concurred.

A petition for a rehearing was denied December 30, 1976, and appellant's petition for a hearing by the Supreme Court was denied February 23, 1977.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.