[S.F. No. 24095. July 8, 1982.]

MARLENE DE LANCIE et al., Petitioners, v.
THE SUPERIOR COURT OF SAN MATEO COUNTY,
Respondent;
JOHN McDONALD, as Sheriff, etc., et al., Real Parties in Interest.

866

COUNSEL

Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, Thomas J. Nolan and Dorothy Glancy for Petitioners.

Quin Denvir, State Public Defender, and Tom Lundy, Deputy State Public Defender, as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Keith C. Sorenson, District Attorney, James W. Foley and David A. Levy, Deputy District Attorneys, for Real Parties in Interest.

James M. Cramer, District Attorney (San Bernardino), and Joseph A. Burns, Deputy District Attorney, as Amici Curiae on behalf of Real Parties in Interest.

OPINION

THE COURT*.—Plaintiffs filed suit for injunctive and declaratory relief, challenging the alleged practice of the San Mateo County Sheriff and other county officials in monitoring and recording conversations of persons detained in county jail awaiting trial. The complaint alleged, inter alia, that the monitoring was not undertaken for security purposes, but rather was utilized primarily to gather evidence for use in criminal trials. The trial court sustained a demurrer without leave to amend to several counts of the complaint, and we granted a hearing to consider whether the alleged monitoring practices exceed the authority of the applicable public officials.

We probe here a very narrow question: may county jail officials monitor ostensibly private conversations between pretrial detainees[1] and their visitors for the purpose of discovering evidence for use in criminal trials, rather than for the purpose of institutional security or public pro-

---

*Before Bird, C. J., Mosk, J., Richardson, J., Newman, J., Kaus, J., and Broussard, J.

[1]A pretrial detainee, hereafter "detainee," is one held in custody pending prosecution of a criminal charge, as distinguished from a convicted and sentenced prisoner.

tection? We explain that by enactment of Penal Code sections 2600 and 2601, the Legislature established a policy that prisoners retain the rights of free persons, including the right of privacy, except to the extent that restrictions are necessary to insure the security of the prison and the protection of the public. Although these statutes speak of persons confined in state prison, detainees in local jails as a matter of logical and constitutional necessity enjoy at least equal rights. Since the allegations of the complaint raise issues of fact as to whether the county monitors conversations for the permissible purpose of safeguarding institutional security and protecting the public, or for the impermissible purpose of gathering evidence for use against the detainees, those allegations state a cause of action under sections 2600 and 2601. We therefore issue a peremptory writ to direct the trial court to overrule defendants' demurrer.

Plaintiffs—three taxpayers, a detainee, and an attorney for several detainees—filed an individual and class action to challenge the surveillance practices in the San Mateo County jail. The trial court sustained defendants' demurrers, without leave to amend, as to the first, second, tenth, eleventh, and twelveth causes of action. Plaintiffs filed the present petition for mandate to overturn the trial court's order.

We begin our analysis by summarizing the allegations of the disputed causes of action. The first cause of action alleges that a detainee's only means of oral communication with a visitor is through a special telephone intercom system installed in visiting areas where the parties are separated by a sound-proof glass panel. The system was "designed and installed in such a manner that conversations could be monitored and recorded without alerting or revealing to plaintiff pretrial detainees and pretrial visitors that their conversations are being monitored and recorded." A guard is stationed on the detainee's side of the panel at a "discreet distance." "The size and arrangement of the visiting facilities, the distance of the guards from the pretrial detainees and their visitors, and the design and use of the telephone communications system combine to deceive plaintiff pretrial detainees and plaintiff visitors by creating the illusion and reasonable expectation of privacy as to their conversations with each other. They are thus encouraged to, and do, discuss the most intimate and private aspects of their lives and feelings."

The jail telephone systems are wired into a central monitor. "An unseen deputy sheriff . . . sits at this master keyboard and is able to, and

does surreptitiously monitor [and record] conversations between plaintiff pretrial detainees and plaintiff visitors." No regulations are in effect to govern the monitoring and recording of conversations or the use of those recordings.

Plaintiffs allege on information and belief that the "conversations are monitored and tape recorded without any probable cause or reasonable suspicion to believe that the contents of said conversations will pertain to illegal acts or activities." Plaintiffs assert that although defendants justify their practice as a means of protecting jail security, "[t]his justification is a sham." Conversations are generally monitored and recorded at the request of the prosecutor or police; "[t]he primary use made . . . of the information gathered by this surveillance is as evidence, or as a means to attempt to gather evidence, in criminal proceedings against plaintiff pretrial detainees and others."

Plaintiffs claim that the described surveillance violates a detainee's right of privacy guaranteed by article I, section 1 of the California Constitution, constitutes an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution and article I, section 13 of the California Constitution, and violates title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510-2520). They do not specifically allege a violation of Penal Code sections 2600 and 2601. That omission, however, is of no consequence so long as the factual allegations of the complaint state a cause of action under those provisions; "[t]he nature of an action and the issues involved are to be determined, not from the appellation given the pleading, but from the facts alleged and the relief that they support." (*Bloniarz* v. *Roloson* (1969) 70 Cal.2d 143, 149 [74 Cal.Rptr. 285, 449 P.2d 221].)

Plaintiffs' second cause of action challenges defendants' policy of random monitoring and recording of private conversations among detainees "in every room in the jail." Plaintiffs assert such surveillance violates the constitutional and statutory provisions referred to in the first cause of action.

Defendants did not demur, or the court failed to sustain demurrers, to the third through ninth causes of action.[2] The remaining causes of

---

[2]The third through the ninth causes of action relate to the monitoring and recording of conversations over public telephone lines and in attorney conference rooms at the jail; the monitoring and recording of privileged communications between detainees and counsel, physicians, and religious advisors; and the uses made by defendants of the recorded conversations.

action (tenth through twelveth) add no new factual allegations of significance to the first and second causes of action, but merely assert the surveillance described in those earlier counts violates additional constitutional proscriptions: that it chills freedom of speech, association, and religion (tenth cause of action); inflicts cruel and unusual punishment (eleventh cause of action); and denies detainees the equal protection of the laws (twelfth cause of action).

The trial court, as we noted earlier, sustained defendants' demurrer without leave to amend to the first, second, tenth, eleventh, and twelfth causes of action. Plaintiffs petitioned for writ of mandate in the Court of Appeal. That court, although recognizing that the use of a prerogative writ to review rulings on questions of pleadings is generally disfavored (see *Babb v. Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379]), found mandamus appropriate because the issues presented were matters of general importance, and the trial court's order would bar such issues from being heard on the merits. (See *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 807 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513].) The Court of Appeal then issued a peremptory writ commanding the trial court to overrule the demurrer as to plaintiffs' first, second, and tenth causes of action. We granted a petition for hearing.

 As we shall explain, we believe the provisions of Penal Code sections 2600 and 2601 are dispositive of the issues presented in this proceeding. Section 2600, as amended by the Legislature in 1975, provides that "[a] person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is *necessary in order to provide for the reasonable security of the institution* in which he is confined and for the reasonable protection of the public." (Italics added.) The broad span of constitutional rights protected by section 2600 is augmented by the terms of section 2601, which specifies that state prisoners "shall have" certain civil rights, among them the right to own or sell property; to buy and read newspapers and periodicals; to marry; to bring civil suits; and, the provision relevant to the instant case, "to have personal visits; provided that the department may provide such restrictions *as are necessary for the reasonable security of the institution.*" (§ 2601, subd. (d).) (Italics added.)

The original version of section 2600, enacted in 1850 as section 145 of the Act Concerning Crimes and Punishments, provided that "[a] sen-

tence of imprisonment in the State Prison for a term less than life suspends all civil rights of the person so sentenced during the term of imprisonment, and forfeits all public offices and all private trusts, authority, and power; and the person sentenced to such imprisonment for life shall thereafter be deemed *civilly dead.*" (Stats. 1850, ch. 99, § 145, p. 247.) (Italics added.) Under that provision, all state prisoners were relegated to the status of social outcasts, victims of the archaic "civil death" doctrine[3] which conceived of prisoners as something less than human beings.

The Legislature modified the civil death statute slightly when inserting it in the Penal Code in 1941 as section 2600; all civil rights of state prisoners were suspended, but the Adult Authority was vested with discretion to restore such rights "as it may deem proper." Not until 1968, however, did the Legislature officially abolish civil death, amending section 2600 to specify that all state prisoners retained certain enumerated civil rights.[4]

Two years later, our court endorsed this critical legislative reform, explaining that, with the amendment of section 2600, "[California has] abandoned the medieval concept of strict 'civil death' and ... replaced it with statutory provisions seeking to insure that the civil rights of those convicted of crimes be limited only in accordance with legitimate penal objectives." (*In re Harrell* (1970) 2 Cal.3d 675, 702 [87 Cal.Rptr. 504, 470 P.2d 640].) Finally, in 1975, the Legislature discarded the punitive version of section 2600 entirely and replaced it with the current version, designed to *protect* rather than eviscerate the rights of state prisoners.

In considering the significance of this dramatic reversal of legislative policy for the instant case, we stress at the outset that the pre-1968 civil

---

[3]"Civil death," the status of a prisoner deprived of all rights, originated in ancient Greece and flourished throughout the Dark Ages as a natural outgrowth of the primitive penal systems developed by the Germanic tribes of Europe. During the latter half of the nineteenth century, virtually every country in Europe rejected the doctrine; California, however, as indicated in the text, adopted civil death—as though bent on rescuing the concept from a well-earned oblivion—only four years before France and the Germanic countries abolished it. (See, e.g., *Civil Death in California: A Concept Overdue for Its Grave* (1975) 15 Santa Clara Law. 427, 429-433; Note, *Civil Death—A New Look at an Ancient Doctrine* (1970) 11 Wm. & Mary L.Rev. 988.)

[4]The 1968 statute reiterated that "imprisonment in a state prison for any term suspends all the civil rights of the person so sentenced," but qualified the civil death doctrine by reviving certain specified civil rights: the rights to inherit property, to correspond confidentially with an attorney, to own all writings produced in prison, and to buy and receive newspapers, periodicals, and books.

death statute never applied to detainees and other persons confined in local detention facilities. (See, e.g., *Hayashi* v. *Lorenz* (1954) 42 Cal.2d 848 [271 P.2d 18]; 18 Ops.Cal.Atty.Gen. 275 (1951).) Because the statute was penal in nature, we construed it strictly and held that it restricted only the rights of individuals sentenced to state prison. (*Hayashi, supra*, 42 Cal.2d at p. 852.) Since the restrictions in the penal versions of section 2600 never applied to pretrial detainees in the first place, it follows logically that the Legislature, in specifically restoring the rights of state prisoners, meant to afford no less protection to pretrial detainees.

Moreover, equal protection principles support the conclusion that detainees retain rights at least equivalent to those guaranteed state prisoners under sections 2600 and 2601. Our Constitution requires that persons "similarly situated with respect to the legitimate purpose of the law receive like treatment." (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) With respect to the monitoring of conversations, detainees and convicted felons are "similarly situated";[5] we must therefore acknowledge that sections 2600 and 2601 apply in this context not only to state prisoners but also to those merely detained pending trial.

The limitations which these provisions impose upon state prison authorities, we conclude, are equally binding upon county jail authorities.[6] The allegations in plaintiffs' complaint will therefore survive demurrer if they assert that the surveillance undertaken by defendants is unnecessary for institutional security or protection of the public and, hence, violates rights protected by sections 2600 and 2601, subdivision (d). We proceed to analyze those allegations.

---

[5]Compare, e.g., *Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691 [139 Cal.Rptr. 700, 566 P.2d 602]. In *Jack M.*, we held that since a fitness hearing is guaranteed to convicted persons by statute, the denial of such a hearing to an unconvicted person would violate equal protection. Compare also *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254], holding that if a "certificate of rehabilitation" is available by statute to restore the civil rights of convicted felons and to allow them to teach at a junior college, such a certificate must be made available to a misdemeanant. The legislative classification otherwise "violates . . . equal protection of law" because it does not "rationally relate[] to a legitimate state purpose." (*Id.* at p. 711]).

[6]We do not imply that county jails must follow exactly the same procedures as are followed in state prisons. Whether a measure is essential to institutional security will depend upon many factors, and thus may vary from one facility to the next. We hold only that the detainees' status as inmates in a county jail instead of state prison in itself is no reason to deny them rights afforded prison inmates.

With respect to surveillance of detainees' conversations with visitors, plaintiffs allege that by means of a covert surveillance system, jail authorities routinely and arbitrarily monitor and record such private conversations, without probable cause to suspect that any illegal activity is taking place. These recordings, the complaint states, are intended not to enhance or preserve prison security, but rather to obtain evidence for use by investigatory and prosecuting agencies in search of convictions. Plaintiffs allege, moreover, that the recording system is entirely unregulated and that no coherent set of rules or guidelines exists to govern the surveillance policies created by officials in different jails.

Plaintiffs' allegations, we find, clearly establish that plaintiffs may be entitled to relief as a consequence of illegal activity on the part of local jail officials. Under sections 2600 and 2601, subdivision (d), those officials may restrict a detainee's visitation rights only to the extent necessary to provide for institutional security.[7] Plaintiffs allege that the system of monitoring detainee-visitor conversations in the San Mateo County jail is not used for the purpose of institutional security or protection of the public; jail officials, plaintiffs assert, eavesdrop on detainees' conversations with visitors primarily to obtain evidence to be used against them at trial. The complaint further alleges the absence of any regulations governing the monitoring of conversations.

In light of sections 2600 and 2601, plaintiffs should be entitled to attempt to prove as a matter of fact their charge that such a pervasive and unregulated surveillance system is not employed to preserve jail security or protect the public, but for the purpose of gathering evidence against the detainees. Proof of such allegations would establish that the surveillance system is being used in a manner which infringes upon the detainees' right of privacy under sections 2600 and 2601.

Defendants, however, argue that dictum in *North v. Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155] settled as a matter of law that routine monitoring of detainee-visitor conversations is essential to institutional security. In *North*, a detective invited a detainee and his wife to use the detective's private office for a conversation, stepped out of the office, and shut the door; we held that because the detective had created a reasonable expectation

---

[7]In *In re French* (1980) 106 Cal.App.3d 74, 84 fn. 22 [164 Cal.Rptr. 800], the Court of Appeal stated that the specific mention of visitation in section 2601 was a legislative "signal to the courts that a claim that a restriction on the right is necessary for prison security should be scrutinized carefully...."

of privacy, the surreptitious recording of the conversation was inadmissible. We then stated in dictum that "nothing in our opinion should be deemed a disapproval of the common practice of monitoring inmates' conversations with others, including their spouses, in visiting rooms or similar places. That practice seems reasonably necessary in order to maintain jail security . . . ." (8 Cal.3d 301, 312.)

The foregoing language served to limit the holding in *North* so that it would not be construed to invalidate the practice, not challenged in *North*, of routine monitoring. The court did not decide that such monitoring was always necessary for institutional security; that issue was not raised in *North*, and could not have been raised since section 2601, subdivision (d), limiting restrictions on visiting to those "necessary for the reasonable security of the institution," had not yet been enacted.[8]

We note, moreover, that the Director of Corrections, pursuant to California decisions defining inmate rights under section 2600,[9] has promulgated regulations which disclose that in his opinion institutional security does not require monitoring such as that described in plaintiffs' complaint. California Administrative Code, title 15, section 3170, expressly directs prison officials to preserve the privacy of inmates and their visitors: "The privacy of individuals and of their visits will not be imposed upon except as is necessary for the identification of persons, and to maintain order and acceptable conduct, and to prevent the introduction of items, commodities or substances which inmates are not

---

[8]At the time *North* was decided, the 1968 version of section 2600 (quoted in fn. 4, *ante*) was in effect. That version, in contrast to the 1975 version of section 2600 which governs our decision in this case, rejected the civil death concept only as to a few specifically enumerated inmate civil rights. The 1968 list did not include the right of private visitation, a right which, as we have explained, is expressly afforded prisoners under the current versions of sections 2600 and 2601. These statutes, indeed, guarantee that prisoners shall retain *all* rights except to the extent that restrictions are necessary for public safety or institutional security. The *North* dictum on which the defendants rely, then, reflected a legislative policy with regard to civil death which has since become defunct.

[9]In a variety of contexts, California courts have consistently held that section 2600 precludes the arbitrary restriction, under the guise of prison security, of a prisoner's right to wear union lapel buttons (*In re Reynolds* (1979) 25 Cal.3d 131 [157 Cal.Rptr. 892, 599 P.2d 86]); to correspond regarding a prison union (*In re Brandt* (1979) 25 Cal.3d 136 [157 Cal.Rptr. 894, 599 P.2d 89]); to have access to appointed counsel in civil cases (*Payne* v. *Superior Court* (1976) 17 Cal.3d 908 [132 Cal.Rptr. 405, 553 P.2d 565]); to correspond with his attorney in confidence (*In re Jordan* (1974) 12 Cal.3d 575 [116 Cal.Rptr. 371, 526 P.2d 523]). See also *In re French*, discussed at footnote 7, *ante*, stressing that the "necessity" requirement governs restrictions concerning prison visits as well.

permitted to possess." (§ 3170, subd. (f).)[10] This regulation is inconsistent with the monitoring practices allegedly adopted by defendants in the present case—practices which intrude on private conversations not for any purpose recognized as legitimate under section 3170, but as a method of obtaining evidence for use in criminal trials. Consequently, despite the dictum in *North*, the question whether routine monitoring of detainee-visitor conversations is necessary for jail security, as well as the question whether defendants monitor for the purpose of security or to gather evidence against the detainees, poses questions of fact which cannot be resolved on the pleadings.

Defendants next point to language in *North*, echoed in many other California cases, that as a general rule "an inmate of a jail or prison has no reasonable expectation of privacy." (8 Cal.3d at p. 311; see *Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 900, fn. 21 [101 Cal.Rptr. 375, 495 P.2d 1295] and cases there cited; *People* v. *Estrada* (1979) 93 Cal.App.3d 76, 98-90 [155 Cal.Rptr. 731].) Since a person's reasonable expectation of privacy in a particular setting plays a part in determining whether he enjoys a legally protected right of privacy in that setting, a factual finding that detainees have no reasonable expectation that their conversations are private might undermine plaintiffs' allegations.[11]

The cited cases, however, do not purport to make a factual determination of the subjective expectations of inmates or the reasonableness of such expectations. Instead they declare a legal proposition: the absence of *any* right of privacy in jail. From that proposition, they reason that prisoners could not reasonably expect that the state will refrain from monitoring their conversations.

The reasoning of those cases, however, cannot properly serve to define the rights granted inmates by sections 2600 and 2601. The Legislature, in enacting these sections, evidently intended to place the

[10]In this regard, we note that the Board of Corrections has enacted a regulation specifically requiring local jail officials to "develop and implement an inmate visiting plan." (Cal. Admin. Code, tit. 15, § 1062.) Plaintiffs have alleged, inter alia, the absence of any such coherent plan.

[11]The role of an individual's subjective expectation of privacy in defining his rights under the Fourth Amendment is a complex issue. (See discussion in Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349, 384; Giannelli, *Prison Searches and Seizures; "Locking" the Fourth Amendment Out of Correctional Facilities* (1976) 62 Va. L.Rev. 1045, 1060; 1 La Fave, Search and Seizure (1978) § 2.1.) The discussion in the cited works makes it clear that as a general rule, the state cannot curtail a person's right of privacy by announcing and carrying out a system of surveillance which diminishes that person's expectations.

rights of inmates as nearly as possible on the same footing as non-inmates, subject to the needs of institutional security or protection of the public. To deny a right of privacy on the ground that inmates, disabused by prior decisions, have lost their normal expectation of privacy would defeat the purposes of the statutes. Thus we cannot, consistently with the policies underlying sections 2600 and 2601, hold as a matter of law that detainees have no reasonable expectation that their conversations with visitors will be private, or that monitoring of such conversations never infringes upon such an expectation of privacy.

For similar reasons we cannot accept the argument that the jail can defeat a detainee's right of privacy by posting a sign warning him of its intention to monitor conversations. That argument rests on the mistaken assumption that the subjective expectation of the person monitored is all that matters in deciding whether a right of privacy has been violated—an argument that drives a gaping hole through the constitutional and statutory right of privacy. (See authorities cited footnote 11, *ante*.) Privacy is not safe if a search or intrusion can be justified merely by proof that the state announced its intention in advance. This court recognized in *People* v. *Hyde* (1974) 12 Cal.3d 158 [115 Cal.Rptr. 358, 524 P.2d 830] that "such a concept would sanction an erosion of the Fourth Amendment by the simple and expedient device of its universal violation." (P. 164, fn. 4.) We must be equally vigilant to prevent the state from eroding the rights granted detainees under Penal Code sections 2600 and 2601 by the expedient of posting notice of its intention to violate those rights.

We therefore conclude that plaintiffs' first cause of action, challenging the monitoring of conversations between detainees and visitors, states facts sufficient to entitle plaintiffs to relief. We apply the same analysis to plaintiffs' second cause of action, which relates to conversations between detainees. Considerations of institutional security or protection of the public may well justify different monitoring practices as to conversations between detainees than detainee-visitor conversations, but in neither case can we determine on the pleadings alone that defendants' monitoring is being done for the purpose of meeting the jail's legitimate security needs.[12] Thus plaintiffs' second cause of action also presents factual issues which cannot be resolved on demurrer.

[12]The statutory language also suggests a distinction between detainee conversations and detainee-visitor conversations. The latter fall within the specific language of section 2601, subdivision (d), which grants the inmate the right "to have personal visits" subject to "such restrictions as are necessary for the reasonable security of the institution." Detainee conversations, on the other hand, fall within no specific provision, and are

Plaintiffs' tenth cause of action incorporates by reference all allegations of the preceding nine causes of action, and adds the allegation that monitoring chills the exercise of First Amendment rights. Since we have held that the first and second causes of action state facts sufficient to constitute a cause of action it necessarily follows that the tenth cause of action, with or without the additional allegations, is also sufficient. The additional allegations obviously were intended to frame a cause of action under the First Amendment and the corresponding California provision (art. I, §§ 2 & 4). ■ ■■ ■ Since we have held, however, that plaintiffs' complaint frames a cause of action on statutory grounds, we need not and do not rule on whether it may also state a cause of action under the cited constitutional provisions.[13]

■ Plaintiffs' eleventh and twelfth causes of action similarly incorporate numbers one through nine, then add allegations charging cruel and unusual punishment (eleventh cause of action) and denial of equal protection (twelfth cause of action). As we explained with regard to the tenth cause of action, the eleventh and twelfth causes of action are sufficient without the additional allegations; we do not determine at this time whether the additional allegations suffice to frame a valid constitutional claim.

In sum, we conclude that insofar as the complaint alleges that the jail officials' monitoring practice has been undertaken for the purpose of gathering evidence for use in criminal proceedings, rather than to maintain the security of the jail, the complaint states a cause of action for declaratory and injunctive relief under sections 2600 and 2601 of the Penal Code. Plaintiffs are entitled to their day in court so that they may attempt to prove the factual allegations of their complaint.

Let a peremptory writ of mandate issue directing the superior court to vacate its order sustaining defendants' general demurrer without leave to amend to the first, second, tenth, eleventh and twelfth causes of

---

protected only under the general language of section 2600; rights conferred by section 2600 may be restrictions "necessary in order to provide for the reasonable security of the institution . . . and for the reasonable protection of the public." On the pleadings, however, it is impossible to determine what differences, if any, in monitoring procedures may be justified by this difference in statutory language.

[13]It is a well established principle that courts should avoid resolving constitutional issues if a case can be decided on statutory grounds. (See *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000]; *People* v. *Gilbert* (1969) 1 Cal.3d 475, 484-485 [82 Cal.Rptr. 724, 462 P.2d 580].)

action, and to undertake further proceedings consistent with the views expressed in this opinion.

**KAUS, J.**—I concur based on my understanding that the majority's recital of the allegation in the complaint that the monitoring was "without probable cause to suspect that any illegal activity [was] taking place" does not imply that monitoring for jail security purposes can only be undertaken on "probable cause." As I understand the law, monitoring for security purposes may be routinely undertaken without any reason to believe that any particular surveillance will disclose evidence of illegal activity. I further assume that if this matter goes to trial, plaintiffs will bear the burden of demonstrating the invalidity of the jail authorities' monitoring practices and that, in the absence of a contrary showing, the monitoring will be presumed to have been undertaken for security purposes.

That having been said, the fact remains that plaintiffs' complaint alleges violations of sections 2600 and 2601 of the Penal Code, in that it alleges that the county's monitoring practice has been undertaken to gather evidence in pending cases *and not for the purpose of jail security.* Although I have no idea how plaintiffs propose to prove that the monitoring is being performed solely to gather evidence and not for security purposes, in view of defendants' demurrer the matter of proof is simply not before us. In light of the Legislature's enactment of sections 2600 and 2601, plaintiffs are entitled to relief if they can show at trial that the monitoring practices are not security measures.

With all respect, it seems to me that Justice Richardson's dissent assumes as a matter of law that plaintiffs cannot possibly meet their burden of proof. This appears to be based on the supposition that any jail monitoring is necessarily undertaken for security purposes. But can we properly hold that that is invariably so? Suppose plaintiffs are able to demonstrate that certain monitoring would not have been undertaken by jail personnel had it not been for a request from the prosecutor's office, which was looking for admissions relating to a crime with which a particular detainee was charged. Surely, were such the case, it would defy the facts to hold that the monitoring was undertaken for security purposes.

With respect to Justice Mosk's dissent, I would simply note that nothing in the majority opinion forbids the authorities to post the sug-

gested warnings. I do not believe, however, that counsel's "general" willingness to have his clients do so moots this proceeding. We are not informed that the warnings have actually been posted. Surely, if the matter is otherwise properly before us, we should not dismiss it merely because at the oral argument counsel expressed some vague willingness to go along with a suggestion from the bench. Furthermore, I believe that jail authorities could reasonably conclude that *secret* monitoring is necessary for security purposes and therefore I am loath to dismiss this proceeding on the assumption that it will be abandoned.

**RICHARDSON, J.**—I respectfully dissent.

The majority, relying solely upon inapposite statutory provisions (Pen. Code, §§ 2600, 2601), challenges the propriety of the routine monitoring of conversations of inmates detained in county jail awaiting criminal trial. The majority assumes that such a practice violates an inmate's privacy interests if conducted for the purpose of gathering incriminating evidence, rather than to safeguard institutional security or to protect the public. To the contrary, as I explain, sounder decisions have uniformly held, as a matter of law, that the practice of monitoring an inmate's conversations is (1) reasonably necessary to maintain jail security, and (2) that a person incarcerated in a jail or prison possesses no justifiable expectation of privacy. Accordingly, regardless of the jail officials' reason for monitoring a particular conversation, the practice is sensible, necessary and proper.

The majority relies exclusively upon sections 2600 and 2601 of the Penal Code. Section 2600 provides that "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, *as is necessary in order to provide for the reasonable security of the institution* in which he is confined and for the reasonable protection of the public." (Italics added.) Section 2601, subdivision (d), describes various civil rights available to prisoners, including the right "To have personal visits; provided that the department may provide such restrictions as are *necessary for the reasonable security of the institution.*" (Italics added.)

Is the monitoring of unprivileged jailhouse conversations "necessary for the reasonable security of the institution"? In the light of the history of violence committed during attempted jailbreaks and the ever-present danger and risks of escape, how can we possibly hold otherwise? To

limit or restrict jail authorities' right to monitor inmates' conversations is to invite further acts of violence and escapes, thereby endangering not only institutional security but the safety of the public as well. This is exactly the position we took 10 years ago in *North v. Superior Court* (1972) 8 Cal.3d 301, 312 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]. In *North,* we held that under the unusual circumstances in that case, a tape-recorded "jailhouse" conversation between husband and wife (see Evid. Code, § 917) should have been ordered suppressed as an impermissible invasion of marital privacy. We were careful, however, to explain the precise limits of our holding, as follows: "*We emphasize that nothing in our opinion should be deemed a disapproval of the common practice of monitoring inmates' conversations with others*, including their spouses, in visiting rooms or similar places. *That practice seems reasonably necessary in order to maintain jail security* and ... is not proscribed by law." (P. 312, italics added, fn. omitted.)

Thus *North* acknowledged *as a matter of law* that the monitoring of jailhouse conversations is "reasonably necessary" to jail security, thereby fulfilling the statutory requirement of sections 2600 and 2601 relied on by the majority herein. The majority, repeatedly and defensively characterizing the *North* exposition as mere "dictum," suggests that the question of the necessity for jail security "poses questions of fact which cannot be resolved on the pleadings." (*Ante*, p. 875.) To the contrary, as *North* indicates, no factual hearing is needed to confirm what both observation and common sense tells us, namely, the routine monitoring of unprivileged jailhouse conversations helps reduce the threat of escapes and accompanying violence. To suggest otherwise, as the majority does, is both naive and a reckless disregard of institutional and public safety. As was stated in *People v. Morgan* (1961) 197 Cal.App.2d 90, 93 [16 Cal.Rptr. 838], and quoted with approval in *North* (8 Cal.3d at p. 309), authority to censor a prisoner's communications "is necessary to protect against escape." (See also *People v. Estrada* (1979) 93 Cal.App.3d 76, 99-100 [155 Cal.Rptr. 731] [monitoring jailhouse conversations is consistent with Pen. Code, § 2600].)

The fundamental risks today, for custodians as for citizens, are no less than they were 10 years ago. Moreover, courts from other jurisdictions have uniformly recognized the *necessity* of routine monitoring of jail or prison conversations. We are not alone in our concerns. (See *United States v. Paul* (6th Cir. 1980) 614 F.2d 115, 116; *United States v. Hearst* (9th Cir. 1977) 563 F.2d 1331, 1344-1346, cert. den. 435 U.S. 1000 [56 L.Ed.2d 90, 98 S.Ct. 1656]; *State v. Ryan* (1976) 145

N.J.Super. 330 [367 A.2d 920].) I have found no case to the contrary, and the majority cites none. The *Ryan* court put it well: "A further rationale underlying the [jailhouse monitoring] rule is premised upon the necessity of jail officials to use reasonable security measures to protect the prisoners and the jail environment. ... [¶] Electronic surveillance ... is an essential prerequisite to the maintenance of security of the jail and its prisoners .... Lack of privacy must be balanced against reasonable security in the jail. In the end, the scales must be tipped in favor of security." (P. 922.)

Apart from the security aspects, a second reason, in my view, conclusively justifies the monitoring in question. Jail inmates have no right to privacy in the traditional and accepted sense. Once again, *North* is directly in point: "[P]rior California cases have uniformly held that an inmate of a jail ordinarily has no right of privacy. [Citations.] The rationale underlying this general rule is based upon a policy favoring the use by jail authorities of reasonable security measures. 'A man detained in jail cannot reasonably expect to enjoy the privacy afforded to a person in free society. His lack of privacy is a necessary adjunct to his imprisonment....' [Citation.]" (8 Cal.3d at pp. 308-309; see *Lanza* v. *New York* (1962) 370 U.S. 139, 143 [8 L.Ed.2d 384, 387-388, 82 S.Ct. 1218]; *United States* v. *Hearst, supra*, 563 F.2d at pp. 1344-1346; *Brown* v. *State* (Fla.App. 1977) 349 So.2d 1196, 1197; *Com.* v. *Look* (1980) 379 Mass. 893 [402 N.E.2d 470, 482]; *People* v. *Blehm* (1980) 44 Colo.App. 472 [623 P.2d 411, 415].) In the words of the United States Supreme Court in *Lanza*, "a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day." (370 U.S. at p. 143 [8 L.Ed.2d at p. 388], fn. omitted.)

The majority apparently contemplates evidentiary hearings in this case to determine whether in fact the monitoring at the San Mateo County jail was undertaken for security purposes, and whether in fact the inmates so monitored did not entertain a reasonable expectation of privacy. In my view, such evidentiary hearings are wholly unnecessary in light of the authorities and principles cited above, which establish both propositions as a matter of law.

I would deny the peremptory writ.

**MOSK, J.**—I dissent.

The basic question before us, as posed by petitioners, is whether the detainees and their visitors have a reasonable expectation of privacy in their jailhouse conversations. The majority blithely assume the answer by speaking in terms of a constitutional right of privacy in a jail (*ante*, p. 876). The concept of one purporting to enjoy privacy while he is under legally authorized supervision would appear to be a monumental anomaly. Nevertheless it is urged that whether such expectation can reasonably exist in the necessarily controlled environment of a jail depends upon the subjective beliefs of the participants.

The subjective is always an elusive matter for analysis. It might be anticipated that an inmate of sophistication, even one of average intelligence, would understand that his ability to communicate in total confidence is likely to be curtailed while he is behind bars. On the other hand, it may also be anticipated that a person of limited experience, perhaps also of limited education and comprehension, might naively believe he could speak freely without any monitoring by authorities who are merely holding him for trial.

It appears to me that there is a remarkably simple solution to the problem: there can be no reasonable expectation of privacy by anyone in a jailhouse if an adequate warning to the contrary is given. This can be accomplished by the posting of signs in the visiting room advising all persons that their conversations may be overheard and recorded by those in charge of the jail. The warning should be large enough to be readily observed, uncomplicated enough to be easily understood, and should be posted so as to be readable by both detainees and visitors. In communities with a substantial number of residents speaking Spanish, Chinese or other foreign languages, the signs should be both in English and the appropriate languages.

Since counsel for respondent, at oral argument, conceded a general willingness to post warning notices, I see no need for the courts to intervene at this time in order to attempt to accomplish much the same purpose. Therefore, I would deny the writ.