[Nos. F004066, F004083. Fifth Dist., June 28, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD EDWARD WEST, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Part III.

**COUNSEL**

Louis, Garcia & Martinez and Robert S. Louis for Defendant and Appellant.

John K. Van de Kamp, Attorney General, W. Scott Thorpe and Krista J. Kmetz, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HANSON (P. D.), Acting P. J.**—Ronald Edward West appeals from a conviction of knowingly, willingly, unlawfully and feloniously bringing marijuana into the Stanislaus County Honor Farm (Pen. Code, § 4573.5).

After appellant's motions to set aside the information and suppress evidence were denied, he pleaded guilty and was sentenced to state prison for one year and four months.

Two appeals were filed by appellant (F004066 and F004083) and were consolidated. The only issues addressed in the briefs involve the appeal in F004083.

## FACTS

On January 6, 1984, an officer at the Stanislaus County Honor Farm received information that marijuana was to be brought into the honor farm. After similar information was received by another officer at the facility, a decision was made for medical staff to conduct a search of inmates returning from work furlough that day. As a result, 40 to 44 inmates, including appellant, were subjected to a full body and cavity search.

While searching appellant, Dr. Lincoln Service felt a foreign object in the rectum. Dr. Service gave appellant an opportunity to expel the item but appellant refused. Dr. Service then extracted a red balloon containing four marijuana cigarettes, using his fingers and a vaginal speculum.

## I

### *The Body Cavity Search.*

The protections afforded by the Fourth Amendment to persons not incarcerated generally are not applied in the same manner to persons held in lawful detention by the government. (*In re Allen R.* (1982) 132 Cal.App.3d 601, 604 [183 Cal.Rptr. 325].) However, an inmate does not forfeit all rights under the Fourth Amendment.

Prison officials in California may subject an inmate to an inspection, either clothed or unclothed, when there is reasonable cause to believe the inmate may have concealed unauthorized or dangerous items or substances on his or her person. (Cal. Admin. Code, tit. 15, § 3287, subd. (b).) The practice of conducting body cavity searches is specifically addressed in the Administrative Code: "Any inspection of body cavities, other than visual or metal detector inspections, will be conducted in a medical setting under the direct supervision of a physician. Any physical intrusion into body cavities must be performed by a physician, and then only after all less obtrusive methods have failed to bring the inspection to a conclusion." (Cal. Admin. Code, tit. 15, § 3287, subd. (b)(2).) This administrative regulation obvious-

ly recognizes the general authority of prison officials to conduct such searches.

The California Supreme Court addressed the general issue of the rights of pretrial detainees[1] in *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142]. In *De Lancie,* the plaintiff sought injunctive and declaratory relief challenging the practices of the San Mateo County Sheriff and other officials who monitored and recorded the conversations of persons detained in county jail awaiting trial. (*Id.,* at p. 867.) Plaintiff alleged this was being done to gather evidence rather than for security reasons. (*Ibid.*)

The *De Lancie* court discussed the rights retained by inmates by virtue of Penal Code sections 2600 and 2601.[2] Section 2600 reads as follows: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." The court noted section 2600 sought to ensure that the civil rights of those convicted of crimes be limited only in accordance with legitimate penal objectives. (31 Cal.3d at p. 871.) The Legislature evidently intended to place the rights of inmates as nearly as possible on the same footing as noninmates, subject to the needs of institutional security or protection of the public. (*Id.,* at pp. 875-876.)

While we find no published case which relies upon *De Lancie* as authority to suppress evidence obtained through an unreasonable search of a prison inmate, a number of cases involving searches occurring before the *De Lancie* opinion was filed[3] indicate such an interpretation of its holding might be possible. (Cf. *People* v. *Valenzuela* (1984) 151 Cal.App.3d 180, 188-189 [198 Cal.Rptr. 469], and *Donaldson* v. *Superior Court, supra,* 35 Cal.3d 24, 39.)

*De Lancie* relied solely upon state grounds. ■ Proposition 8 eliminated judicially-created remedies for violations of search and seizure pro-

---

[1]*De Lancie* decided the very narrow question of whether county jail officials could monitor the private conversations of pretrial detainees and their visitors for the purpose of discovering evidence for use in criminal trials, rather than for the purpose of institutional security or public protection. *De Lancie* does, however, provide a discussion of prisoners' rights in California, and for that reason is discussed here.

[2]Section 2601 provides that inmates retain the right to inherit property, communicate with an attorney or public official, obtain legal materials, have personal visits, marry, create a power of attorney, and initiate civil actions.

[3]*Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24 [196 Cal.Rptr. 704, 672 P.2d 110], held that *De Lancie* could only be applied to searches occurring after the opinion was filed.

visions of the federal or state Constitution, through the exclusion of evidence obtained, except to the extent that exclusion remains federally compelled. (*In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744].)

Although *De Lancie* relied on two Penal Code sections in its analysis, those sections do not authorize specifically the exclusion of evidence. They merely delineate the rights retained by individuals who are imprisoned. Consequently, the exclusion of evidence obtained through an unlawful search of a prison inmate is governed by federal precedent.

■ Body cavity searches are severe intrusions of a person's right to privacy, and to conduct such a search without a warrant more than a mere suspicion that evidence may be obtained must be present. (*Rivas* v. *United States* (9th Cir. 1966) 368 F.2d 703, 710.) The indication or "plain suggestion" that the individual whom the authorities want to search is concealing something within a body cavity must be "clear." (*Henderson* v. *United States* (9th Cir. 1967) 390 F.2d 805, 808.)[4] The level of suspicion required in border searches as discussed in *Henderson* and *Rivas* does not necessarily apply when the search is conducted in prison.

■ Internal security is a compelling governmental interest justifying restrictions on prison inmates' privacy and related rights. (*Pell* v. *Procunier* (1974) 417 U.S. 817, 822 [41 L.Ed.2d 495, 501, 94 S.Ct. 2800, 2804].) The scope of a prisoner's Fourth Amendment rights must be narrowed to accommodate institutional objectives (*Bell* v. *Wolfish* (1979) 441 U.S. 520, 546 [60 L.Ed.2d 447, 573, 99 S.Ct. 1861, 1878]), but a prisoner loses only those rights that need be sacrificed to serve legitimate penological needs. (*United States* v. *Lilly* (5th Cir. 1978) 576 F.2d 1240, 1244.) As a result of the decreased expectation of privacy by inmates and the exigencies inherent in a prison environment, the government is not required to obtain a warrant or establish probable cause to conduct searches and seizures of inmates. (*Ibid.*) However, as the Fourth Amendment mandates, searches or seizures conducted on prisoners must be reasonable under all the facts and circumstances in which they are performed. (*Ibid.*) The more intrusive the search, the heavier the government's burden of proving the search was reasonable. (*Id.,* at pp. 1245-1246.)

---

[4]In *United States* v. *Montoya de Hernandez* (1985) 473 U.S. — [87 L.Ed.2d 381, 105 S.Ct. 3304], the Supreme Court held that a 16-hour detention, a pregnancy test, and a rectal examination of a woman entering the United States were justified. The court noted the federal government has important interests in protecting the integrity of the border. The rectal examination revealed 88 cocaine-filled balloons. The search was based upon a "reasonable suspicion that [the traveler] was an alimentary canal smuggler." (*Id.,* at p. — [87 L.Ed.2d at p. 385].)

 The United States Supreme Court in *Bell* v. *Wolfish, supra,* 441 U.S. 520 [60 L.Ed.2d 447] stated that lawful incarceration brought about the lawful withdrawal or limitation of many privileges and rights—a retraction the court felt was justified by the considerations underlying the penal system. Among the various issues involved in *Bell,* the court specifically addressed the question of whether *visual* body cavity inspections could be conducted on less than probable cause. (*Id.,* at p. 558 [60 L.Ed.2d at p. 480].) In another context, the court stated that when an institutional restriction infringes on a specific constitutional guaranty, the practice must be evaluated by considering the central objective of prison administration—the safeguarding of institutional security. (*Id.,* at p. 547 [60 L.Ed.2d at p. 473].) After balancing the significant and legitimate security interests of the institution against the privacy interests of inmates, the court concluded that visual body cavity searches could be conducted on less than probable cause. (*Id.,* at p. 560 [60 L.Ed.2d at p. 482].) The court balanced four factors before making a determination on the reasonableness of the visual body cavity search: the scope of the intrusion; the manner in which the search was conducted; the justification for initiating it; and the place in which it was conducted. (*Id.,* at p. 559 [60 L.Ed.2d at p. 481].)

Applying the factors discussed in *Bell,* the scope of the search did not exceed that which was intended originally and ample justification existed for initiating the search. There is always an important need within a prison or detention facility to preserve internal order and discipline, maintain security, and rehabilitate prisoners. (*Procunier* v. *Martinez* (1974) 416 U.S. 396, 404 [40 L.Ed.2d 224, 235, 94 S.Ct. 1800, 1807].) The officials at the honor farm had adequate justification to conduct the search when informed that drugs would be brought into the facility.[5] The actual search took place in a trailer instead of a hospital or a prison clinic;[6] however, the search was performed by a licensed physician[7] using acceptable medical procedures and methods. The rectal search, from evidence of the procedure used, was not unduly harsh or oppressive, nor particularly prolonged. Taking all factors into consideration, the search was reasonable.

A recent United States Supreme Court case involving "shakedown" searches indicates that wholly random searches are essential to effective security of penal institutions. In *Hudson* v. *Palmer* (1984) 468 U.S. 517 [82 L.Ed.2d 393, 104 S.Ct. 3194], the court addressed the issue of an inmate's

---

[5]The issue of the informant's credibility was not raised on appeal, and will therefore, not be considered.

[6]Title 15, section 3287, subdivision (b)(2), of the California Administrative Code, does not explain what a proper "medical setting" is.

[7]Although Dr. Service was not a licensed proctologist, he had practiced proctology for almost 30 years.

right to privacy as a protection against an unreasonable search. *Hudson* dealt particularly with the Fourth Amendment's application to inmates within a prison cell subject to a random "shakedown" search. (*Id.*, 468 U.S. at p. — [82 L.Ed.2d at p. 400, 104 S.Ct. at p. 3198].) Although recognizing that inmates retain some constitutional rights, the court felt the complete withdrawal of certain rights is often " 'justified by the considerations underlying our penal system.' " (*Id.*, 468 U.S. at p. — [82 L.Ed.2d at p. 401, 104 S.Ct. at p. 3199.) In addition, the court stated that the curtailment of certain rights is often necessary as a practical matter, "to accommodate a myriad of 'institutional needs and objectives' of prison facilities, . . ." (*Ibid.*)

The court noted that the uncertainty accompanying random searches of cells probably makes these searches the most effective weapon in the continuing fight against the proliferation of knives, guns, illicit drugs, and other contraband. (*Id.*, 468 U.S. at p. — [82 L.Ed.2d at p. 404, 104 S.Ct. at p. 3201].) "A requirement that even random searches be conducted pursuant to an established plan would seriously undermine the effectiveness of this weapon. It is simply naive to believe that prisoners would not eventually decipher any plan officials might devise for 'planned random searches,' and thus be able routinely to anticipate searches." (*Hudson* v. *Palmer, supra,* 468 U.S. at p. — [82 L.Ed.2d at p. 404, 104 S.Ct. at p. 3201].)

A Florida District Court of Appeal in *Vera* v. *State* (Fla. 1981) 400 So.2d 1008, a case involving almost the same factual situation as the present one, determined that a body cavity search was reasonable. Prison officials at the Dade Correctional Institution were informed by a source within the prison that the defendant, who had been assigned to a work detail with the Department of Transportation, and another unnamed inmate would bring marijuana into the prison concealed in their anal cavities. (*Id.*, at p. 1009.) A body cavity search of all inmates on the work detail was conducted. The Florida court admitted the search was more intrusive than the search upheld in *Bell;* however, the court felt the intrusiveness of the search was more than offset by the justification for initiating it. (*Id.*, at p. 1010.) Traditionally, prison administrators have been given wide latitude in their adoption of proper methods for maintaining order and discipline within the facility. (*Id.*, at p. 1011.) After balancing the need to maintain prison security against the intrusion of the defendant's privacy, the court concluded the body cavity search was reasonable. (*Ibid.*)

Because inmates of the Stanislaus County Honor Farm are away from the facility and unsupervised for a period of time almost every day, the danger that some form of contraband will make its way into the facility is heightened. Whether the information concerns the bringing in of marijuana or a form of weapon, the security risks exist. Serious problems arise when drugs

are available within a prison setting. For these reasons, a body cavity search of minimum security prisoners can be justified. ▮ In the prison context, the government must show that a legitimate penological need necessitates the search, and that it cannot be satisfied by a more narrow means. (*United States* v. *Lilly, supra,* 576 F.2d 1240, 1246.) ▮ In light of the information that was obtained, a different type of search not only would have been useless, but would not even have supplied the level of probable cause appellant is urging as necessary to conduct the search.

We conclude that based on all the factors discussed, and recognizing the value of continuing work furlough programs to improve the health and welfare of prison inmates while allowing and necessitating their absence from prison, the search was reasonable.

## II

### *Method Used to Conduct the Body Cavity Search.*

Appellant also argues that the manner in which the body cavity search was conducted was unreasonable and shocking to the conscience and therefore the evidence obtained should have been suppressed. We disagree.

▮ Body cavity searches are neither unreasonable per se under the Fourth Amendment nor violations of due process procedures guaranteed by the Fifth and Fourteenth Amendments. (*People* v. *Scott* (1978) 21 Cal.3d 284, 293 [145 Cal.Rptr. 876, 578 P.2d 123].) ▮ When a warrant is sought to conduct a body cavity search, many factors are considered to determine whether the character of the requested search is appropriate. They concern the crime allegedly being committed, society's interest in punishing the act, and the reliability of the means employed to conduct the search.[8] (*Ibid.*) These factors are then balanced against the severity of the proposed intrusion. (*Ibid.*) Of course, the more intense, unusual, prolonged, uncomfortable, unsafe or undignified the procedure, or the more it intrudes upon essential standards of privacy, the greater the requirement that the procedure be found necessary. (*Ibid.*) ▮ A warrant was not obtained here, but the above factors aid in determining the reasonableness of the search of appellant.

▮ The search was conducted by a doctor using acceptable medical procedures. Although Dr. Service was not a licensed proctologist, he had

---

[8]The factors considered also include the strength of law enforcement suspicions that evidence of crime will be revealed, the importance of the evidence sought, and the possibility the evidence may be recovered by alternative means less violative of Fourth Amendment freedoms.

practiced proctology for many years. Furthermore, the actual procedure took no more than a few minutes[9]—not an unreasonable amount of time for such a search when conducted properly. The procedure used by Dr. Service was not unusual, prolonged, or unsafe under the circumstances. The necessity for the procedure was evident and justified. Prison security potentially was at risk and no other option was available to prevent the contraband from being taken into the honor farm.

The actual procedure used to conduct the body cavity search was not unreasonable or shocking to the conscience. The motion to suppress was denied properly.

## III

*The Identity of the Informant.*[*]

. . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Hamlin, J., and Martin, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 3, 1985. Bird, C. J., and Broussard, J., were of the opinion that the petition should be granted.

---

[9]In a declaration attached to a motion to suppress, appellant claimed the procedure lasted about five minutes and that he bled for a number of hours afterward.

[*]See footnote, *ante,* page 326.